LYON TYLER MATTHEW, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
LEWIS N. HILL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
HOLLAN L. FLOYD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 86447, 88480, 88939. Filed June 27, 1962.

# 418

*Lucius A. Buck, Esq., Horace R. Drew, Jr., Esq.,* and *Theodore W. Glocker, Jr., Esq.,* for the petitioners.

*Kenneth G. Anderson, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax of the petitioners for the taxable years and in the amounts as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Lyon T. Matthew | 1956 | $565.68 |
|  | 1957 | 896.70 |
| Lewis N. Hill | 1956 | 783.00 |
|  | 1957 | 1,190.17 |
|  | 1958 | 1,311.87 |
| Hollan L. Floyd | 1956 | 724.00 |
|  | 1957 | 842.59 |
|  | 1958 | 931.29 |

The question common to each of these consolidated cases is whether the petitioner was a bona fide resident of a foreign country or countries during the years in question with the result that his compensation is excludible from gross income pursuant to section 911(a)(1) of the Internal Revenue Code of 1954. The petitioner Hill also alleges error of the respondent in disallowing certain claimed exemptions.

FINDINGS OF FACT.

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

All three petitioners are citizens of the United States and filed their income tax returns for the years involved with the district director of internal revenue, Jacksonville, Florida. During the years in question they were employed at various sites in the Bahama Islands (Grand Bahama, Eleuthera, San Salvador, and Mayaguana) and on Antigua and Ascension Islands, by the Down Range Missile Division of Pan American World Airways, Inc., under circumstances hereinafter described.

Prior to 1950 the United States Government established at Cape Canaveral, Florida, a site for the development of a long range missile program. The responsibility for the development of this program devolved upon the United States Air Force.

In 1950 an agreement was entered into between the United States and the United Kingdom of Great Britain and Northern Ireland, with the concurrence of the government of the Bahama Islands, providing for a guided missile flight testing range to extend through the Bahama Islands and the waters adjacent thereto, and to be used by both governments. The agreement was effective for a period of 25 years and thereafter until 1 year from the day on which either government should give notice to the other of its intention to terminate. The

United Kingdom agreed, among other things, to provide such sites in the Bahama Islands as might be necessary for the purpose of the operation of the flight testing range, so long as the agreement remained in force.

Among other things, the above agreement provided that the immigration laws of the Bahama Islands should not operate to prevent admission into the islands of any United States national employed by or under a contract with the Government of the United States in connection with the flight testing range; that such nationals so employed in the islands, or their wives or minor children, should not be liable to pay income tax in the islands, or any poll tax, or tax on ownership or use of property within a site; that the United States should have the right to establish military post offices on the sites for use of the civilian personnel, including contractors and their employees; that no customs duties or other taxes on goods should be imposed by the Bahama Islands upon the personal belongings or household effects of contractors and their employees, nationals of the United States, employed in connection with the flight testing range, and that no export tax should be charged in the event of reshipment thereof from the Bahama Islands; and that with respect to security offenses, either on or off the site, committed by a United States national not subject to United States military or naval law, the United States should have exclusive jurisdiction under certain circumstances, and that under certain circumstances the United States and the Bahama Islands should have concurrent jurisdiction over all other offenses committed inside the sites, but that otherwise the jurisdiction of the civil courts of the Bahama Islands should not be affected.[1]

---

[1] The agreement provides in part:

*Article V*
*Jurisdiction*

(1) The Government of the United States of America shall have the right to exercise the following jurisdiction over offenses committed in the Bahama Islands:

\* \* \* \* \* \*

(d) Where the accused is not a member of the United States Forces, a British national or a local alien, and is not a person subject to United States military or naval law, and a civil court of the United States is sitting in the Bahama Islands, exclusive jurisdiction over security offenses committed inside the Sites; concurrent jurisdiction over all other offenses committed inside the Sites and, if a state of war exists, over security offenses committed outside the Sites.

(2) Wherever, under paragraph (1) of this Article, the Government of the United States of America has the right to exercise exclusive jurisdiction over security offenses commited inside the Sites, such right shall extend to security offenses committed outside the Sites which are not punishable under the law of the Bahama Islands.

\* \* \* \* \* \*

(5) In every case in which under this Article the Government of the United States of America has the right to exercise concurrent jurisdiction, the following provisions shall have effect:

(a) The case shall be tried by such court as may be arranged between the Government of the Bahama Islands and the United States authorities.

\* \* \* \* \* \*

(c) Where the offense is within the jurisdiction of a civil court of the Bahama Islands and of a civil court of the United States, trial by one shall exclude trial by the other.

\* \* \* \* \* \*

Subsequently other agreements were executed between the Government of the United States and the Government of Great Britain providing for the extension of the flight testing range to include Antigua and Ascension Islands, such agreements being substantially the same as the above-described agreement. The United States also entered into similar agreements with Brazil and the Dominican Republic.

Thereafter missile-tracking stations were constructed on sites over the 5,000-mile range extending from Cape Canaveral, Florida, to Ascension Island, including bases upon the islands of Grand Bahama, Eleuthera, San Salvador, Mayaguana, Antigua, and Ascension. Each of these was established as an auxiliary Air Force base under the command of an Air Force officer, and flew both the American and the British flags at the same level.

In 1953 the United States Air Force entered into a cost plus fixed fee contract with Pan American World Airways, Inc., hereinafter referred to as Pan American, under which Pan American undertook to furnish the services and materials necessary for the management, op-

---

(8) Nothing in this Article shall affect the jurisdiction of a civil court of the Bahama Islands except as expressly provided in this Article.

\*      \*      \*      \*      \*      \*      \*

*Article XII*
*Immigration*

(1) The immigration laws of the Bahama Islands shall not operate or apply so as to prevent admission into the Bahama Islands, for the purposes of this Agreement, of \* \* \* any person (not being a national of a Power at war with His Majesty The King) employed by, or under a contract with, the Government of the United States of America in connection with the establishment, maintenance, or use of the Flight Testing Range ; but suitable arrangements shall be made by the United States to enable such persons to be readily identified and their status to be established.

(2) If the status of any person within the Bahama Islands and admitted thereto under the foregoing paragraph shall be altered so that he would no longer be entitled to such admission, the United States authorities shall notify the Government of the Bahama Islands and shall, if such person be required to leave the Bahama Islands by that Government, be responsible for providing him with a passage from the Bahama Islands within a reasonable time, and shall in the meantime prevent his becoming a public responsibility of the Bahama Islands.

\*      \*      \*      \*      \*      \*      \*

*Article XIV*
*Customs Duties and Other Taxes on Goods*

(1) No import, excise, consumption or other tax, duty or impost shall be charged on :

\*      \*      \*      \*      \*      \*      \*

(c) goods consigned to the United States authorities for use of institutions under Government control known as Post Exchanges, Ships' Service Stores, Commissary Stores or Service Clubs, or for sale thereat to members of the United States Forces, or civilian employees of the United States being nationals of the United States and employed in connection with the Flight Testing Range, or members of their families resident with them and not engaged in any business or occupation in the Bahama Islands ;

(d) the personal belongings or household effects of persons referred to in sub-paragraph (c) of this Article and of contractors and their employees being nationals of the United States employed in the establishment, maintenance, or use of the Flight Testing Range and present in the Bahama Islands by reason only of such employment.

(2) No export tax shall be charged on the material, equipment, supplies or goods mentioned in paragraph (1) in the event of reshipment from the Bahama Islands.

\*      \*      \*      \*      \*      \*      \*

(4) Administrative measures shall be taken by the United States authorities to prevent the resale of goods which are sold under paragraph (1)(c), or imported under paragraph (1)(d) of this Article, \* \* \* and generally to prevent abuse of the customs privileges granted under this Article. \* \* \*

eration, and maintenance, under the direction and authority of the Air Force, of the missile test range facilities installed by the Air Force at the various bases at Cape Canaveral and nearby Patrick Air Force Base (headquarters of the Air Force Missile Test Center), and downrange. It also provided that the contractor would be responsible for the compliance, by all contractor personnel, with the provisions of the international agreements. The Air Force agreed to furnish air transport facilities for the transportation of Pan American supplies and personnel to the island bases. The contract was, by its terms, for a period of 1 year, but from time to time it was extended until 1956 when another similar contract was entered into between the same parties, which in turn was extended periodically to the present time.

At each of the bases above referred to there was a base manager who was a Pan American employee and who was directly in charge of the Pan American personnel on such base. Pan American employees did not take orders from the Air Force officer in command of the base. It was agreed between the Air Force and Pan American that Air Force base regulations would not be applicable to Pan American except as the latter might agree.

Each of the downrange bases included, in addition to structures for technical purposes, quarters for personnel, a subsistence or dining room building, a supply building, a vehicle maintenance building, a power building, a laundry building, a post exchange, a recreation building, and various facilities for recreation such as tennis, basketball, baseball, and swimming. The buildings were, in general, constructed of wood with cement asbestos siding and cement floors covered by asphalt or vinyl tile. The quarters for personnel were generally of the barracks variety—one being of the bay type with common bath and toilet facilities and accommodating from 40 to 50 men, and the other being comprised of about fifteen 2-man rooms with adjoining toilet facilities. The quarters were provided by Pan American to its employees free of charge.

United States nationals employed by Pan American at the downrange base were permitted to use the military post offices at the same postal rates applicable to mail service within the territorial limits of the United States, and were permitted to use the post exchanges.

Food, prepared and served by Pan American cooks, was provided for the Pan American employees in cafeteria-style dining halls located on the bases, at no cost to the employees. Laundry service was provided by Pan American free of charge, but there were no drycleaning facilities on any base. A roving barber employed by Pan American visited each base periodically and made a charge for haircuts.

The bases on Grand Bahama, San Salvador, Mayaguana, and Antigua were surrounded by barbed wire fences and were guarded

by unarmed Pan American security guards who checked on vehicles going in and out of the bases. However, the employees were not restricted to the bases and were permitted to come and go as they pleased during nonworking hours.

In a 1952 addendum to the above agreement of July 21, 1950, between the United States and Great Britain it was provided that all contractors working with the Long Range Proving Ground should furnish the comptroller of customs and the immigration officer of the Bahama Islands a list of names of all their employees who were to enter the Bahamas to work on the long range proving ground projects. It was also provided that the contractors would inform such officials when any of these employees ceased to be engaged in such work. It was also therein agreed that the employees would not be charged duty on any personal effects which they required during the period of their employment in the Bahamas, but that the personal effects of an employee would become liable for duty should he decide to retain these personal effects in the Bahamas after ceasing to be employed in long range proving ground work. Pursuant to this agreement Pan American periodically, during the years 1956, 1957, and 1958, furnished the appropriate authorities the names of their employees who were employed downrange.

Vehicles owned by the contractors or by their personnel, except those used only within the confines of the airbase, were required to be registered with and licensed by the colonial government concerned upon payment of the customary fees. The contractors and personnel having automobiles were held responsible for compliance with all the local laws concerning the operation of motor vehicles.

Grand Bahama, Eleuthera, San Salvador, and Mayaguana are all Bahama Islands governed by a colonial government located in Nassau, through a resident commissioner.

Grand Bahama is located 65 miles east of West Palm Beach, Florida. It is 83 miles long and has an average width of 4 miles. It has a main highway which runs a distance of about 70 miles. In 1958 it had an estimated population of 5,800, about 1 percent being of European descent. It has schools which, however, do not go beyond the elementary level. The principal industries are fishing and lumbering. During 1956 to 1958 the community nearest the Air Force base having housing facilities for families was Freeport, located about 25 miles away.

Eleuthera is located midway down the Bahama chain, about 58 miles east of Nassau. It is approximately 90 miles long and varies in width from one-half mile to 5 miles. Farming and fishing are the main occupations. A paved road extends the length of the island. In 1958 its estimated population was about 4,000, which included several hundred residents of European descent. There are a limited number

of rental homes available on the island. The local schools do not go beyond the 12th grade.

San Salvador is located about 124 miles southeast of Eleuthera. It is 12 miles long by 6 miles wide. It has no significant industry. It has 10 miles of paved roads and 30 miles of unpaved roads. In 1958 its estimated population was less than 1,000, no large number being of European descent. There are no hotels or private rental housing facilities on the island. Its schools do not go beyond the elementary level.

Mayaguana is located about 100 miles southeast of San Salvador. It is 28 miles long and 7 miles wide. Its population in 1958 was estimated at about 700, no large number being of European descent. Farming and fishing are the major occupations. It has no hotels or rental housing facilities and no paved roads. It has elementary schools.

Antigua is located about 1,250 miles from Cape Canaveral. It is about 16 miles long and 12 miles wide. A British administrator heads the local government. Its chief industry is the production and exportation of sugar, cotton, bananas, and pineapples. It also has a growing tourist trade. In 1958 its estimated population was 52,450, about 4 percent being of European descent. It has about 64 miles of paved roads. It has a hospital and several doctors and dentists. It has several hotels, but private rental housing is limited and expensive, and market supplies are meager. It has educational facilities running through the high school level.

Ascension is a British possession located about 5,000 miles from Cape Canaveral, Florida. It is less than 7 miles in diameter. In 1958 its estimated population was about 200 persons, principally employees of a British wireless company. It has a small hospital and one British resident doctor. There are no hotels or rental housing accommodations. It has one British elementary school. It has no commercial air transportation facilities and only infrequent steamship service.

Each of the petitioners in taking the employment in question with Pan American signed a document setting forth the conditions of employment, which provided in part as follows:

In consideration of my employment, and as a condition of continued employment, by Pan American World Airways, Inc., hereinafter referred to as "the Company", I hereby acknowledge and agree that said employment is and shall at all times remain subject to the following terms and conditions:

1. The employment shall be for work in the Guided Missiles Range Division of the Company and shall be in connection with performance, and subject to all requirements, of Contract No. AF 18(600)–881 between the United States of America and the Company, at such places and for such time as the Company may determine. Any different or further employment at any time by any of the Divisions of the Company shall be at the sole discretion of the Company.

Each of the petitioners also signed another document which prohibited outside business activities which conflicted with the interests of Pan American. Such document specifically prohibited all such activities, while an employee was foreign based, other than that for which he was granted entry. When an employee was given a regular downrange assignment, no time limit was specified.

Pan American personnel who were assigned downrange were required to work any and all hours necessary to accomplish the mission of the range, although, insofar as possible, a normal workweek was envisioned. Each of them was paid by Pan American a base salary and, in addition, a 30-percent bonus while working downrange. This bonus was intended to serve as an incentive for overseas duty and as compensation for irregular working hours and weekend duty required at the bases. Pan American paid its downrange personnel once a month. A salary advance expense check was issued to each person once a month in an amount not exceeding $75, which Pan American considered to be ample for the needs of its employees assigned downrange. Each employee was required to designate a bank of his choice and to open an account at such bank prior to going down range, and on the last day of each month the remainder of the employee's salary was sent to such bank.

Each such employee became eligible for a paid vacation of 20 working days after having completed 12 months of service. In addition, while on regular downrange duty, employees were granted periods of special leave time, known as SLT, to give them an opportunity to transact personal business, obtain dental care, and "to have a change of scenery." This special leave time was normally given for 7-day periods.

After a probationary period Pan American's downrange personnel and their dependents became entitled to a 50-percent discount on Pan American fares. After working for Pan American for a year, a 90-percent discount was given to personnel for vacation travel. The downrange employees were also permitted to fly free of charge between the bases and the United States on Air Force flights.

It was a fixed policy of Pan American not to permit wives and families to accompany employees stationed on the islands. At times, however, some of the employees did take their families and dependents to some of the islands.

In a booklet which Pan American provided its downrange employees, it was stated:

Although many of our employees have realized substantial benefits from the provisions of the income tax law, the Company takes no position concerning possible eligibility. It is strictly between the employee and the agent of the Bureau of Internal Revenue to whom he sends his return.

*Facts Relating Particularly to Petitioner Lyon Tyler Matthew.*

Petitioner Lyon T. Matthew was born on December 19, 1911. He completed high school and 2 years of college.

From 1930 to 1934 he worked in Norfolk, Virginia, as a billing clerk, except for a short time with the United States Merchant Marine. In 1935 he moved to Miami, Florida, where he worked on a farm for about a month and then was employed by Burroughs Adding Machine Company as a stenographer and office manager. In February 1937 he began working in the office of the University of Miami and took a few courses in the evening at that school. He later took a job as a bookkeeper in Miami from which job he was furloughed for several months in 1940 because of illness. He was then drafted for military service but was rejected because of his medical history.

In 1942 he went to a training school at Warner Robins Air Force Field, Georgia, where he took shop training, aircraft training, mechanical drawing, and drafting.

He was married in 1943, and has two children, a boy and a girl who at the time of the trial were ages 14 and 16, respectively.

In August 1944 he joined the Merchant Marine where he remained until December 5, 1945. During the time he was in the Merchant Marine his wife lived in Miami with her brother.

In February 1946, he was employed by a Pan American subcontractor and at the beginning of April he was employed by Pan American itself in its Latin American Division as a junior accountant. He was first stationed in Miami and later was sent to the Canal Zone as an assistant restaurant manager for 9 months. During 3 of those months he had his wife and daughter with him in the Canal Zone, but since the living expenses were so high he was forced to return them to Florida. At the end of 1946 he returned to Miami as a junior accountant and stayed with Pan American until late in 1950. At that time he went to Hendersonville, North Carolina, where he carried on a baking business for a couple of months. He then was employed by Olin Mathieson Chemical Company for about 4 years. His family was with him in North Carolina but he did not own a home.

In August 1954, he was employed by the Guided Missile Range Division of Pan American as a senior accountant and signed the documents above referred to relating to conditions of employment. He was stationed at Patrick Air Force Base. About a year later he became property control supervisor at that base. In August 1955, he purchased a house at 23 Vesta Circle, Melbourne, Florida, which is near Patrick Air Force Base, taking title jointly with his wife as tenants by the entirety, and he and his family lived there. He and his wife still own this house and his family is still living in it.

On or about November 1, 1955, Matthew applied for a downrange assignment. He sought this assignment because this type of work had appealed to him ever since 1946 when he worked for the Latin American Division of Pan American. He thought that such assignment would be more interesting and stimulating, and it was his intention to remain on the missile stations indefinitely and make a career of it.

On November 1, 1955, he was given a regular assignment to work as base accountant at San Salvador. His duties consisted of controlling the cash working fund, controlling the 35 native Bahamian employee jacket files, acting as paymaster to such Bahamians, and keeping a record of equipment leased to Pan American for use at the station.

At the time he was assigned to San Salvador, Matthew had no plans to change his wife's place of residence, although he did hope to bring her to San Salvador if suitable quarters became available.

On San Salvador Matthew lived in the barracks and ate in the company dining hall. He worked a 44-hour week, and during off-duty hours he was permitted to come and go as he chose unless otherwise advised by the base manager. His recreation on the island consisted of playing volleyball and swimming at the base. He visited the commissioner of the island and a couple of people who were well known in the community of Cockburn Town. Once or twice he accompanied the base medic to make sick calls to people on the island who were not employees of Pan American. As a representative of Pan American, he, in all contacts with the native people, attempted to make them feel that he was interested in their welfare.

On January 19, 1956, Matthew returned to the United States for a visit with his family and stayed until January 27.

In the latter part of February 1956, Matthew was transferred to Grand Bahama Island where he was employed as the base accountant. He ate in the company messhall and shared, with the company medic, an apartment in the barracks consisting of two bedrooms and bath with a porch. In 1956 he purchased in the United States various items of furnishings for this apartment.

When he was transferred to Grand Bahama, Matthew did not take his wife with him. He and other employees later conceived the idea of leasing land and placing thereon trailers to be obtained from Florida in order to bring their families to the island, and in April 1956 Matthew signed a lease on some property, paying $100 in advance as the yearly rental. However, after investigation, he decided that due to the scarcity of food, fresh water, and medical and educational facilities, his wife should remain in Melbourne, Florida, until some future date when he might find more suitable quarters for her. He sold his lease in May 1956 to an employee of another company for $100.

Matthew's recreational time at Grand Bahama was spent at West

End and at Freeport, the latter being a predominately white community having many new homes, an administration building, new clubs, a supermarket, and a new communications station. He met the resident manager of the island and made friends with various residents whom he saw socially on frequent occasions. He attended the Anglican church at West End.

Matthew remained on Grand Bahama until May 3, 1957. During the time he was stationed at Grand Bahama he made trips to Melbourne, Florida, on an average of about once every 2 months on special leave time, temporary duty, and excused absences. Such trips were taken either by commercial plane or by Air Force plane. When the trips were by commercial plane, the duration of the stay in the United States was about 1½ days; when by Air Force plane, about 5 days. The use of Air Force planes was limited to about 4 times a year. Included in those trips was a vacation trip of about 2 weeks to Melbourne at Christmas 1956.

In April 1957 Matthew volunteered to be transferred to Ascension Island in order to get in on the ground floor of the base, and because he was interested in visiting St. Helena Island, about 750 miles from Ascension. On May 3, 1957, he went from Grand Bahama Island to Patrick Air Force Base and spent his annual vacation with his family at Melbourne.

About June 1, 1957, he flew to Ascension Island where he was employed as the base accountant. While stationed on this island he met the commissioner of the island and his family as well as the manager of the wireless company, and made other friends. He obtained from the magistrate a license to drive a motor vehicle. While he was there he made two trips by steamship to St. Helena Island. He remained on Ascension Island for about 6 months, and then requested a transfer.

On December 15, 1957, he was transferred back to Patrick Air Force Base and on the same day was assigned to Grand Bahama. He took a vacation of about 30 days at Melbourne and arrived at Grand Bahama about the middle of January 1958. He again lived in the same quarters in the barracks which he had previously occupied and which contained the furnishings he had previously purchased. He then purchased additional furnishings. His family continued to reside at Melbourne, Florida, although at this time he further investigated the possibility of moving them to Grand Bahama.

In the latter part of 1958 Matthew was given the job of roving accountant, which entailed the relief of various base accountants when they were sick or on vacation. In this capacity he has had a 10-day assignment at Eleuthera, a 3-week assignment at Puerto Rico, and temporary assignments at Antigua and San Salvador, returning after such temporary assignments to Grand Bahama. At the time of the trial of this case Matthew was still assigned to Grand Bahama. He

had recently investigated the possibility of obtaining a position for his wife in Freeport, in which case she would be entitled to obtain a home there in which she and Matthew could live. Up to the time of the trial of this case Matthew has continued to make trips from Grand Bahama and Antigua to the United States on vacation and special leave time, ranging in duration from 4 to 30 days.

Since April 1959 Matthew has maintained a savings account at Barclays Bank at Freeport. In 1959 he became a member of a social club in Freeport. He has received mail on Grand Bahama at both the British post office and the military post office. In 1961 he purchased a plot of ground on Grand Bahama near West End and near a housing project which is expected to open soon. In traveling between the Bahama Islands and the United States he has always stated on customs forms that he was a resident of the Bahama Islands and a nonresident of the United States. At the time of the trial of this case Matthew had served about 5 years and 4 months downrange, and during this time he spent a maximum of about 7 weeks per year in the United States.

Matthew has had a joint bank account with his wife at a bank in Melbourne since 1955. His salary, including the 30-percent downrange bonus, was transmitted by Pan American directly to such bank, except for about $50 to $75 per month which was paid directly to him at his station. He maintained an account at Sears, Roebuck & Company. His wife was employed in 1958, 1959, and 1960 at a school cafeteria in Melbourne, but was not employed during 1956 or 1957. Matthew's children have continued to attend school in Melbourne, Florida. Neither he nor his wife belong to any social, civic, or fraternal organizations in the United States, and he has not voted in the United States since 1954. He has never been affiliated with any church at Melbourne, but his wife belongs to a church there which she and the children attend. Matthew has owned automobiles since 1950 which were kept with his family in Florida and which bore Florida tags. He has continued to retain a Florida driver's license. Matthew's vacation and special leave time has been spent at Melbourne with his family and when there he has attended church with his family.

The house which Matthew had acquired in Melbourne, Florida, in 1955 originally had two bedrooms and one bath. In early 1958 an additional bedroom and a bath were added to the house. This was done as a convenience for Matthew's son and daughter, as a convenience to him when he visited Melbourne, and in order to make the house more salable. In January 1956 he made an application to the local tax assessor for exemption from taxation under the homestead provisions provided by the State of Florida, in which he stated that he resided on the property and in good faith made the same his permanent home, and declared that he was a citizen of the State of Florida. He therein

stated that he would be a registered voter in Florida within 2 weeks. Renewal applications for exemption were made in 1957, 1958, and 1959, which were signed by his wife alone and in which she stated that she resided on the property and made it her permanent home. In 1961 the attorney general of Florida rendered an opinion that Matthew's wife was entitled to the homestead tax exemption on her interest in the property "notwithstanding her husband may be a citizen and resident of the Bahama Islands."

In his Federal income tax returns for the taxable years 1956 and 1957 Matthew showed compensation of $5,653.07 and $6,518.08, respectively, received from Pan American. It was shown that tax in the amount of $41.58 had been withheld from his compensation in 1956 and that there had been no withholding in 1957. On each return he showed no tax due. In the notice of deficiency the respondent determined that the compensation received from Pan American was not exempt from tax under the provisions of section 911 of the Internal Revenue Code of 1954, stating that it had been determined that the petitioner was not a bona fide resident of a foreign country during either of such years and that he had not been physically present in a foreign country for 510 days out of any period of 18 consecutive months.

The petitioner Matthew was a bona fide resident of the island of San Salvador from January 1, 1956, until about February 25, 1956, of Grand Bahama Island from that time until about June 1, 1957, of Ascension Island until December 15, 1957, and of Grand Bahama Island throughout the remainder of the taxable year 1957.

### Facts Relating Particularly to Petitioner Lewis N. Hill.

The petitioner Lewis N. Hill was born on January 28, 1913. He attended schools in Indiana, Florida, and Niles, Michigan. He had 1 year of mechanical engineering training at the Chicago Technical College during 1938 or 1939. Thereafter he worked for his father in a furniture store in Niles, Michigan, for about 3½ or 4 years.

He was married on January 23, 1942, to Marjorie Vose. Two children were born of this marriage, Robert Lewis Hill, born October 1, 1948, and Kay Irene Hill, born March 13, 1950.

From June 1942 until November 1945, Hill served in the Army and after discharge rejoined his father in the furniture store, and purchased a home in Niles. At the beginning of 1946 he purchased the furniture store from his father and continued in the furniture business until June 1954, at which time the business deteriorated and was liquidated.

On November 10, 1952, Hill was divorced from Marjorie by a decree of the Circuit Court of Berrien County, Michigan, which awarded the wife the care and custody of the children, and required petitioner

to pay $15 per week for the support and maintenance of each child until such child should graduate from high school. Pursuant to order of the court, the petitioner transferred ownership of the house in Niles to the wife.

On December 15, 1953, Hill married his second wife, Ethel, and lived with her in an apartment above the furniture store at Niles. Ethel had been previously married and had three sons by the former marriage, all of whom lived with Hill until one of them entered the military service.

At the end of June 1954 Hill, after closing the furniture store, moved to Orlando, Florida, where he, his wife, and her sons lived in a trailer park. He leased and ran the trailer park as a business from June 1954 until March 1955, and then ran a filling station.

On May 23, 1955, Hill was employed by the Guided Missile Range Division of Pan American as a supply clerk, and signed the above-described documents relating to conditions of employment. He was first stationed at Patrick Air Force Base. About 2 months later he brought his wife and family to nearby Cocoa, Florida, where they lived in a trailer. About 2 months thereafter, the petitioner applied for downrange employment and was given a regular assignment at Grand Bahama Island as a supply clerk.

On November 16, 1955, he visited his family at Cocoa, Florida, for 4 days and on December 9, 1955, he again visited Cocoa for 7 days. The petitioner then returned on December 16, 1955, by commercial airline to Grand Bahama accompanied by his wife and her two sons, Mack and Jerry Sampson. In the latter part of December 1955, the petitioner and his family, with the permission of the commissioner of the island, moved into a small British Government owned house near the base. The petitioner had his household effects and the family car sent to the island.

The family remained with the petitioner on Grand Bahama until the middle of January 1956 when Ethel had to return to Florida for a medical conference in regard to her son Mack. The petitioner had been advised that he was to be transferred, and he vacated the house, turned it over to new occupants, and prepared to send the household effects back to the United States. He also sold the family car and gave the proceeds to his wife.

On January 28, 1956, Hill was transferred to Mayaguana as a supply clerk, and was later promoted to supply supervisor. He lived in a two-man room in the barracks and ate at the company messhall. There was no suitable family housing available on Mayaguana. Petitioner's family continued to live at a trailer park at Cocoa, Florida.

While on Mayaguana, Hill was free to leave the base at any time except during working hours. He became acquainted with the com-

missioner of the island through business association and was invited to the commissioner's house twice at Christmastime. Similarly, he also knew the constable of the island. He attended the Baptist Church at Abraham's Bay regularly and contributed to that church and also attended an American Missionary Church at Pirates Wells. He participated in various social events of the island, and attended a political meeting as an observer.

Hill's assignment at Mayaguana continued until the middle of January 1959, a period of about 3 years, when he was transferred to San Salvador. During that interim he made trips on the indicated dates to the United States for vacations, on special leave time or for medical care, and spent the indicated number of days in the United States:

| Date | Length of stay (days) | Date | Length of stay (days) |
|------|------|------|------|
| Feb. 24, 1956 | 6 | Aug. 23, 1957 | 5 |
| Apr. 4, 1956 | 8 | Nov. 12, 1957 | 30 |
| July 3, 1956 | 6 | Feb. 25, 1958 | 6 |
| Aug. 9, 1956 | 6 | May 2, 1958 | 4 |
| Aug. 24, 1956 | 17 | Aug. 27, 1958 | 6 |
| Dec. 7, 1956 | 5 | Sept. 15, 1958 | 38 |
| Jan. 6, 1957 | (not shown) | Dec. 29, 1958 | 7 |

On only the first two trips did he visit his family at Cocoa, Florida.

On the January 6, 1957, trip he filed a bill of complaint for a divorce from his wife Ethel in Brevard County, Florida, in which he alleged that he had been an actual bona fide resident of Brevard County for more than 90 days previous to the filing of the complaint. The complaint was prepared by a Florida attorney who had been advised by Hill that he was working and residing in the Bahama Islands. He obtained the divorce in June 1957.

Hill remained on San Salvador until November 12, 1959. While there he made three trips to the United States, one on February 21, 1959, for 5 days, one on March 20, 1959, for 17 days, and one on August 13, 1959, for 7 days. On the March 20, 1959, trip he married Simone Guillen. On his application for a marriage license he stated that his address was 306 Lawsona Boulevard, Orlando, Florida. This was the address of his mother. He had visited his mother there and used that address as a permanent United States address, but he had never lived there.

Hill did not take his wife Simone to San Salvador because there was no housing available for her. On September 12, 1959, he leased a lot on San Salvador for a period of 5 years, renewable for an additional 5 years, calling for a rental of $20 per year, with the intention of building a home thereon. He also bought some lumber from a lumberyard in Nassau and had it delivered to the lot, and purchased a pump from Sears, Roebuck & Company in the United States and

paid customs duties for its importation. However, shortly after starting to build the house he was notified that he was to be transferred to another island. He sold the lumber to local people.

On November 12, 1959, Hill was transferred to Antigua where his job was that of supply senior. For about 2 months he lived in a company-furnished barracks. On December 31 he rented a partly furnished house in Gambles Terrace, St. Johns, Antigua, paying $66 per month rental. He purchased locally some beds and mattresses. On January 16, 1960, his wife Simone came over to the island to live and has lived there since that time. At the time of the trial there were also living with Hill on Antigua his son and daughter by his first marriage, Robert and Kay, and they were attending school on the island.

On March 23, 1960, Hill purchased an automobile on Antigua and obtained a local driver's license. He purchased food from local groceries, supermarkets, and street vendors on the island. He and his wife have attended school PTA meetings, and to some extent have participated in the social life on the island, such as attending dances, visiting beaches, and dining with local people in their homes.

In traveling between the United States and the islands Hill stated on customs forms that he was a nonresident of the United States and a resident of the particular island where he was assigned.

Since the time he was employed by Pan American, Hill has maintained a bank account at the Barnett National Bank at Cocoa, Florida, and Pan American has regularly sent his salary checks to that bank, except for the previously described salary advance expense checks. Since he has been on Antigua he has also had a checking account with the Royal Bank of Canada at Antigua.

Hill applied for downrange employment because of the 30-percent increase in pay and because of the increased possibility of promotion. A further reason was to take advantage of the income tax refund on becoming a resident of a foreign country. His intention was to make this a career and to become a resident of the islands, and his intention has never changed.

During the years 1956, 1957, and 1958 Hill paid for the support of his two children by his first marriage, Robert and Kay, pursuant to the order of the divorce court of Berrien County, Michigan, the respective amounts of $1,075, $1,415, and $2,511.89. During those years his first wife Marjorie had net rental income of about $20 to $30 per month from apartments which she owned. She also was a substitute schoolteacher in Niles, Michigan, and received from this source about $10 per week. In 1956, the girl was 6 years old and the boy was 8.

Mack and Jerry Sampson, the two sons of Hill's second wife Ethel, lived with her in 1956 in Cocoa, Florida. Their ages at that time were

20 and 12 years, respectively. Hill sent checks to Ethel for support of herself and her children. He also sent checks for rent, clothing, etc., purchase of a sewing machine, and purchase of a trailer. The total of all such payments was about $2,900 in 1956. During that year Ethel worked about 3 or 4 weeks, earning about $35 a week, and she also received a social security check in the amount of $70 per month specifically for the support of these children.

In his income tax returns for the taxable years 1956, 1957, and 1958, Hill reported compensation of $4,841.50, $6,607.55, and $7,127.65, respectively, received from Pan American and showed that there had been withheld from his compensation during those years the respective amounts of $163.45, $584.57, and $920.12. On each return he showed no tax due. In his return he did not report any income attributable to Ethel.

In his return for the year 1956, Hill claimed six exemptions, one for himself, one for his wife Ethel, one each for his children by his first marriage—Robert and Kay—and one each for the children of his second wife—Jerry and Mack Sampson. In his returns for each of the years 1957 and 1958, he claimed three exemptions, one for himself and one for each of the children by his first marriage—Robert and Kay.

In the notice of deficiency, the respondent determined that the compensation received from Pan American was not exempt from tax under the provisions of section 911 of the Internal Revenue Code of 1954, stating that it had been determined that the petitioner was not a bona fide resident of a foreign country during any of such years and that he had not been physically present in a foreign country for 510 days out of any period of 18 consecutive months. In such notice of deficiency the respondent also disallowed for the year 1956 all the claimed exemptions except one for the petitioner himself, stating that the petitioner had not established his right to the other exemptions. For the years 1957 and 1958 the respondent also disallowed the exemptions claimed for the petitioner's children, Robert and Kay, stating that the petitioner had not established his right to such exemptions.

The petitioner Hill was a bona fide resident of Grand Bahama Island from January 1 to January 28, 1956, and of the island of Mayaguana for the remainder of that taxable year and throughout the taxable years 1957 and 1958.

*Facts Relating Particularly to Petitioner Hollan L. Floyd.*

The petitioner Hollan L. Floyd was born in Weston, West Virginia, on April 21, 1921. He left West Virginia when he was in the sixth grade and moved to New York City where he remained until the

completion of 2 years of high school. He then moved to Los Angeles, California, where he worked in a grocery store.

On May 1, 1940, he enlisted in the Army Air Corps and served in China, Burma, and India. While stationed in Karachi, India, he suffered a compound fracture of his skull and was hospitalized for a year and a half. He was medically discharged from the Army on May 5, 1943, and continued to be hospitalized in Los Angeles, California, for 6 months, after which he remained in that city for rehabilitation. His injury resulted in frequent periods of blacking out and this limited the types of employment he could accept. This physical disability made it difficult for him to hold a job and for a period of time he worked in various capacities in Reno, Nevada; Oakland, California; Eugene, Oregon; Tooele, Utah; and Pensacola, Florida.

While living in Eugene, Oregon, Floyd was married and divorced twice. A child, David, was born of the first marriage.

On January 18, 1954, Floyd was employed by the Guided Missile Range Division of Pan American and was stationed at Cape Canaveral, Florida. On June 1, 1954, Pan American assigned him to San Salvador as a fire security guard. He signed the above-described documents relating to conditions of employment. On San Salvador he lived on the base.

While he was on San Salvador, Floyd came into contact with the native population. He became acquainted with a native minister and, at the latter's request, conducted two religious services for him, and one service for a minister at Cockburn Town. He discussed with the minister and others of the population their feelings about God, standards of living, and the American way of life. He also participated in such athletics as softball and cricket with the natives of the island.

While on San Salvador in 1954 Floyd recognized the opportunity to regain his health and to revamp his life, and realized that he was happy to remain downrange, regardless of the circumstances. He also realized that there was the opportunity to do something not only for Pan American but also for the United States.

About the end of 1954, Floyd was recalled to Patrick Air Force Base and was informed that it had been determined that due to his previous head injuries, he should not be around fire-fighting equipment and that, therefore, termination of his employment had been recommended. After discussing with his superior his previous experience and difficulties in retaining a job due to his injury, Pan American decided to give him a job in the supply department of the company. Pursuant to this decision, he was assigned to Grand

Bahama Island as a supply clerk in charge of shipping and receiving. He arrived at Grand Bahama prior to Christmas of 1954.

While on Grand Bahama Floyd's contacts with the people of the island were usually in connection with such athletic activities as softball, cricket, and touch football. He sustained an injury to his heel and was treated by a German doctor who was a resident of the island.

On or about October 21, 1955, Floyd was married in Folkston, Georgia, to Katie Mange who had been previously married and who had a home in Orlando, Florida. He did not set up another home for her and did not live with her except on two occasions when he was on leave or vacation—a total of about 1 month. No children were born of this marriage. He was divorced from Katie about a year later. In the complaint filed by him on September 19, 1956, in the divorce proceedings in Florida, he alleged that he was and had been a bona fide resident of the State of Florida for more than 90 days immediately prior to the filing of the complaint. He had made a full disclosure of all facts to the Florida attorney who was representing him.

On April 5, 1957, he was married to Elizabeth Higgenbotham in Jacksonville, Florida. After a honeymoon in Weston, West Virginia, and Shreveport, Louisiana, Floyd brought his wife back to Jacksonville, where she continued to live with her family. He did not live with her except at her parents' home while he was on visits. He considered taking her to Grand Bahama but found that no suitable housing was available.

Floyd remained on Grand Bahama until about July 1, 1957, a period of about 2½ years, when, at the request of his base manager, he was transferred to Ascension Island. During that time he made a number of trips to the United States, including a vacation trip of about 1 month in February 1956, and a vacation trip of about the same time in April 1957. He took several other trips to the United States, in each case staying a few days. It was on his vacation in 1957 that he married Elizabeth Higgenbotham. One trip was made in September 1956 to sign the divorce complaint against his wife Katie.

The petitioner's assignment at Ascension Island was that of supply assistant in charge of shipping and receiving. While there he also acted as the manager of a radio station licensed by the British Government and established by private individuals to boost the morale of the personnel on the base. While there Floyd obtained a local driver's license. In the latter part of December 1957 he returned to Jacksonville on vacation and stayed until sometime after January 9, 1958, during which time his wife gave birth to a child. On May 27, 1958, he returned to Jacksonville for a few days. In October 1958 he flew home to take a vacation of about 30 days. During 1958 he also

took trips to Brazil, Peru, and Venezuela. He remained at Ascension Island until sometime in 1959, when he was transferred to Antigua.

The petitioner's job on Antigua was the same as that on the other islands. His entertainment there included visits to various hotels. He engaged in some social activities with local people, such as dancing. He belonged to a tennis club on Antigua. He obtained a local driver's license. He purchased some furniture from the blind institute on the island.

During 1959 Floyd consulted a Florida attorney with a view to obtaining a divorce from his fourth wife, Elizabeth, it being his intention, upon the granting of such divorce, to marry a woman who was a British subject and a resident of Antigua.

In the latter part of 1960 Floyd was transferred to Eleuthera Island as a supply assistant in charge of shipping and receiving. He lived on the base as he had on the other islands. While there he was a member of a social club. He attended church at St. Johns and contributed thereto weekly. During 1960 and 1961 he rented a post office box at the Governor's Harbor British post office. At the time of the trial of this case Floyd was still stationed on Eleuthera Island.

While stationed on the islands Floyd established credit accounts with stores in the United States in order to purchase articles which could not be purchased at the base PX, and to buy things for his wife. He also had a Standard Oil Company credit card. During 1957 he purchased a Ford automobile in Orlando, Florida, but permitted this to be repossessed at the time he and his wife Elizabeth were being divorced.

Floyd has been receiving benefit payments from the Veterans' Administration since 1946. These were sent directly to Floyd's bank in Cocoa, Florida.

The petitioner owns a 2-acre plot of unimproved land on Merritt Island, Florida, 15 or 20 miles from Patrick Air Force Base. He visited it in 1957 and 1958. Just prior to his marriage to Elizabeth in 1957, he took her to view the property. He had purchased the property on a deferred payment plan in order that his parents, who live in Seattle, Washington, might have something when payments were completed.

At the time of the hearing in this case, the petitioner's downrange service, about 7 years, was about the longest of any Pan American employee. His trips to the United States have been temporary, on special leave and vacation, with no intention of remaining in the United States. He maintains no dwelling place in the United States. He feels loyal to Pan American because of the fact that he has received favorable treatment from the company despite his injury.

Floyd's salary checks, except for advance salary expense checks, have been sent by Pan American directly to the Barnett National Bank of Cocoa, Florida, where petitioner has an account.

In his income tax returns for the taxable years 1956, 1957, and 1958 Floyd reported compensation of $4,505, $5,122.17, and $5,501.25, respectively, received from Pan American, and showed that there had been no tax withheld therefrom. On each return he showed no tax due.

In the notice of deficiency the respondent determined that the compensation received from Pan American was not exempt from taxation under the provisions of section 911 of the Internal Revenue Code of 1954, stating that it had been determined that the petitioner was not a bona fide resident of a foreign country during any of such years and that he had not been physically present in a foreign country for 510 days out of any period of 18 consecutive months.

The petitioner Floyd was a bona fide resident of Grand Bahama Island from January 1, 1956, until about July 1, 1957, and of Ascension Island for the remainder of that taxable year and throughout the taxable year 1958.

OPINION.

Each of the petitioners contends that he was "a bona fide resident of a foreign country or countries" during the years involved, within the meaning of section 911(a)(1) of the Internal Revenue Code of 1954.[2] None of them claims that he qualifies for exemption under section 911(a)(2) by having been physically present in a foreign country or countries during at least 510 full days of any period of 18 consecutive months.

Neither section 911(a)(1) nor its predecessor, section 116(a) of the 1939 Code, contains a definition of "a bona fide resident of a foreign country or countries," and its meaning must be derived from the legislative intent. The legislative history of this provision has been reviewed in a number of cases. *Swenson* v. *Thomas*, (C.A. 5) 164 F. 2d 783; *Fuller* v. *Hofferbert*, (C.A. 6) 204 F. 2d 592; *Weible* v. *United*

---

[2] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.
,(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:
(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

*States*, (C.A. 9) 244 F. 2d 158; *Downs* v. *Commissioner*, (C.A. 9) 166 F. 2d 504, certiorari denied 334 U.S. 832, affirming 7 T.C. 1053 and 7 T.C. 1136; *Arthur J.H. Johnson*, 7 T.C. 1040; *C. Francis Weeks*, 16 T.C. 248; *Meals* v. *United States*, (N.D. Cal.) 110 F. Supp. 658; and *White* v. *Hofferbert*, (Md.) 88 F. Supp. 457. It is not necessary to repeat such history in its entirety. Prior to 1943 the test as to taxability of such income as is here involved was whether the taxpayer was, for more than 6 months of the taxable year, a bona fide nonresident of the United States. However, since Congress concluded that this provision had suffered considerable abuse in that persons had absented themselves from the United States for more than 6 months simply for tax evasion purposes (S. Rept. No. 1631, 77th Cong., 2d Sess., p. 54 (1942–2 C.B. 504, 549)), it enacted section 148(a) of the Revenue Act of 1942 which amended section 116(a) to require that the taxpayer be a bona fide resident of a foreign country or countries. In this connection S. Rept. No. 1631 further stated at page 116:

In the application of such provision, the tests as to whether a taxpayer is a resident of a foreign country or countries will be those generally applicable in ascertaining whether an alien is a resident of the United States. Vacation or business trips to the United States during the taxable year will not necessarily deprive a taxpayer, otherwise qualified, of the exemption provided by this section.

Section 1.911–1(a)(2) of the Income Tax Regulations (consistent with prior regulations promulgated after the amendments made by the 1942 Act) provides that whether an individual citizen of the United States is a bona fide resident of a foreign country shall be determined by the application, to the extent feasible, of the principles of section 871 and the regulations thereunder, relating to what constitutes residence or nonresidence in the United States in the case of an alien individual. Section 1.871–2(b) of the Income Tax Regulations provides:

*Residence defined.* An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

It has been held that the above regulations are especially authoritative because they serve to implement a purpose not set forth in detail. *Seeley* v. *Commissioner*, (C.A. 2) 186 F. 2d 541, affirming in part 14 T.C. 175; and *Leigh White*, 22 T.C. 585.

The question whether a taxpayer is a bona fide resident of a foreign country is essentially a question of fact and each case must be decided on the basis of its particular facts. *Donald H. Nelson*, 30 T.C. 1151.

In *Swenson* v. *Thomas, supra,* the court discussed the requirement of the regulations as follows:

It excludes "a mere transient or sojourner," and correctly. A transient means literally "one going across" or passing through. "Sojourner" is built around the French word "jour," meaning a day, and signifies a mere temporary presence or visit. The Regulation continues: "A mere fleeting intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States (or Colombia) and has no definite intention as to his stay he is a resident. One who comes to the United States (or Colombia) for a definite purpose which in its nature may be promptly accomplished he is a transient, but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States (or Colombia) he becomes a resident, though it be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned."

We have carefully examined all the evidence with respect to each of the petitioners and have concluded and have found as a fact that each petitioner was a bona fide resident of a foreign country or countries during the taxable years involved.

The petitioners were not employed for a specific project or for a limited time. Each signed an agreement with Pan American under which his services were to be performed at such places and at such times as the company might determine. None of the assignments to a particular site was for a limited time. The work which each was to perform was not by its nature work that would be promptly accomplished, but was of a continuing nature. Such work in each case had to do with the management, operation, and maintenance of the downrange bases. The agreement between the United States and the foreign governments involved provided for the continuance of these bases for a period of 25 years and thereafter until either government should give notice to the other of its intention to terminate the agreement. Although Pan American's contracts with the Air Force, the first of which was entered into in 1953, have been nominally for a period of 1 year, they in fact have been extended periodically and Pan American at the time of the hearing was still managing, operating, and maintaining the bases. Under these circumstances, it is our conclusion that the work to be performed by the petitioners was not inherently of short duration, but was of indefinite duration.

We are also satisfied from the testimony of the petitioners themselves, and from other corroborating evidence, that it was the intention of each of them to remain indefinitely in such Pan American downrange service and on any island to which he was assigned.

The petitioner Matthew testified that the overseas assignment with Pan American appealed to him, that he considered such work interesting and stimulating, and that it was his intention to remain on the missile stations indefinitely and make a career of it. He applied for downrange assignment about November 1, 1955, and at the time of the hearing in this case he had been employed downrange for a period of about 5⅓ years. His first assignment, on November 1, 1955, was San Salvador. He stayed there until the latter part of February 1956, a period of about 4 months, when he was transferred to Grand Bahama Island. His assignment on Grand Bahama continued until about June 1, 1957, a period of about 1¼ years. He volunteered to be transferred to Ascension Island and stayed there about 6 months, when he requested a transfer. He was transferred on December 15, 1957, to Grand Bahama, and such assignment continued thereafter up to the time of the trial of this case.

The petitioner Hill testified that he applied for downrange employment as a career. He applied for such downrange assignment about the latter part of September 1955, and at the time of the hearing of this case he had been employed downrange for a period of about 5½ years. His first assignment was at Grand Bahama, where he stayed for about 4 months when he was transferred, on January 28, 1956, to Mayaguana. He remained on that assignment until the middle of January 1959, a period of about 3 years, when he was transferred to San Salvador. He stayed there for a period of about 10 months and was then assigned to Antigua on November 12, 1959, and was still so assigned at the time of the hearing in this case.

The petitioner Floyd testified that in 1954 while he was assigned to San Salvador he recognized the opportunity to regain his health and to revamp his life and that he was happy to remain downrange. He stated further that he feels loyal to Pan American because of the fact he has received favorable treatment from the company despite his injury and that he realized that there was an opportunity downrange to do something not only for Pan American, but also for the United States. At the time of the hearing in this case he had been assigned downrange about 7 years, and in point of service he was among the oldest of Pan American's downrange employees. He was first assigned to San Salvador on June 1, 1954, as a fire security guard. After about 6 months Pan American decided that due to his injury he should not be around fire-fighting equipment and accordingly transferred him, in the latter part of December 1954, to Grand

Bahama as a supply clerk. He remained there for about 2½ years, when, about July 1, 1957, he was transferred to Ascension Island. He remained there until sometime in 1959 when he was transferred to Antigua. In the latter part of 1960 he was transferred to Eleuthera where he was located at the time of the hearing of this case.

It is true that Pan American discouraged the taking of families to the islands (providing only barracks for the employees), that there was, generally speaking, inadequate family housing on the islands, and that during the years in question none of the petitioners had his wife or family with him, except for a period of 2 weeks in January 1956 when Hill had his family with him in a house on Grand Bahama. However, despite this we are satisfied that the intention of each petitioner was to remain indefinitely on the islands. Each of them at times made attempts to find housing for his family at his place of assignment, but without success. Matthew in 1956 leased some property on Grand Bahama with a view to housing his family in a trailer thereon, but found that other facilities would be inadequate. In 1961 he purchased a lot close to a housing project on Grand Bahama. In 1959 Hill leased a lot on San Salvador with the intention of building a home thereon for himself and his wife, but a transfer to another island frustrated his intention. He later, after the years in question, found accommodations on Antigua and took his family there.

The fact that the petitioners made frequent trips back to the United States to visit their families and for other purposes is not, in our opinion, indicative of an intention on their part to stay only temporarily on the islands. In each instance the intention was that the trip back to the United States would be temporary.

As shown in our Findings of Fact, the petitioners in documents relating to homestead tax exemption, marriage certificates, and complaints for divorce, made certain statements which might tend to indicate that they intended to retain their residences in the United States. However, considering the purposes for which such statements were made, and the explanations given with respect to some of them, it is our opinion that they do not destroy the overall effect of their testimony and other evidence that their intention was to stay downrange indefinitely. Their representations as to residence for those purposes cannot be considered determinative of the question of residence for purposes of section 911 (a) (1) of the Code. Similar statements made by the taxpayers in *White* v. *Hofferbert, supra*, and *Weible* v. *United States, supra*, were held not determinative.

There remains for consideration the question whether, within the meaning of the regulations, each petitioner made his home temporarily in the foreign country or countries. As stated, each of them,

with one minor exception, resided in the company-supplied housing and ate at the company messhalls. In *Swenson* v. *Thomas, supra,* the court held that making a "home temporarily" does not mean necessarily buying a house, but means no more than living in a foreign country temporarily. In *Seeley* v. *Commissioner, supra,* it was stated that a man who settles down to an indefinitely continuing performance of duties, for the time being at least, has a "home." In *Fuller* v. *Hofferbert, supra,* it was stated that a citizen makes his home temporarily in a foreign country when he enters into the life of the community, takes part in the activities of the people, engages in social intercourse with the citizens, cultivates friendships with them, and identifies himself with their daily lives and their amusements, while intending to continue to live in their country for an indefinite period. And we have in effect held that a citizen is making his home temporarily in a foreign country even though he resides in company-furnished facilities. *Leonard Larsen,* 23 T.C. 599. See also *Audio Gray Harvey,* 10 T.C. 183. Here the petitioners, although living upon the bases, were free to come and go as they pleased, except during working hours, and they did, in fact, as pointed out in the Findings of Fact, associate with the people of the various islands and attended social functions and institutions on the islands.

We have carefully considered the contentions made by the respondent. His position is that the petitioners are in a unique position in that special provisions were made for their entry on the islands for purposes of the work in connection with the long range missile program. He points out that they were not subject to tax on the islands, that they could import certain necessary items, including their household goods, free of duty, and that to some extent they were subject to the jurisdiction of the United States with respect to crimes committed. He contends that they were under the direct control and jurisdiction of the United States and that they were, in essence, employees of an instrumentality of the United States. He maintains that they did not undertake any of the obligations of a bona fide resident of a foreign country, such as submission to a foreign sovereign or making a home in a foreign country, and that under these circumstances they should not be considered as bona fide residents of a foreign country or countries under the statute.

The petitioners were not under the direct control and jurisdiction of the United States and were not employees of an instrumentality thereof. They were employed and compensated by Pan American and were under its direction and control, albeit they undertook to abide by the provisions of the agreements between the United States and the foreign governments. The situation of Pan American's downrange personnel probably was unique in that they were subject

to concurrent jurisdiction of the United States and the local government for offenses committed on the sites, if a civil court of the United States should be sitting in the Bahama Islands, and under some circumstances they were subject to the exclusive jurisdiction of the United States for security offenses committed either on or off the sites. Otherwise, however, the jurisdiction of the local courts was not affected. Such personnel were also relieved of some burdens normally incident to foreign residence, such as taxes and import duties. However, we do not believe that these facts require or justify the conclusion that their residence was tantamount to residence in the jurisdiction of the United States. It has been held that, although avoidance of double taxation may have been one of the motives for the original enactment of section 116(a) of the 1939 Code, the payment of taxes to a foreign government, or liability therefor, was not made a condition precedent to the permitted exemption. *David E. Rose*, 16 T.C. 232; *White* v. *Hofferbert*, *supra*, and *Meals* v. *United States*, *supra*.

The respondent has cited the so-called "war-worker" cases,[3] in which exemption was denied. Although there are some similarities between those cases and the instant cases, there are distinguishing differences. In those cases, unlike the instant cases, the employment abroad was to be for a limited duration, and in some of them the taxpayers were restricted to military bases and were subject to military regulations. Under these circumstances the conclusion was reached that such taxpayers were merely transients or sojourners, rather than bona fide residents. The instant cases are also distinguishable from cases involving technicians working abroad under contracts to work for specific periods of time or to work on specific projects. Examples of these are *Jones* v. *Kyle*, (C.A. 10) 190 F. 2d 353, certiorari denied 342 U.S. 886; *C. Francis Weeks*, *supra*; *Joseph A. McCurnin*, 30 T.C. 143; and *Ernest Rudolf Hertig*, 19 T.C. 109.

We think the facts here presented clearly show that the petitioners were not mere transients or sojourners on the islands to which they were assigned, but were bona fide residents. The situation here presented is more nearly analagous to that obtaining in *Swenson* v. *Thomas*, *supra*; *Audio Gray Harvey*, *supra*; *Leonard Larsen*, *supra*; and *Fred H. Pierce*, 22 T.C. 493, in which the taxpayers were held to be bona fide residents of a foreign country. It may be added that here, as in the *Swenson* case, there was no want of good faith on the part of the petitioners. They were on the islands for a bona fide business purpose and not to evade taxes.

---

[3] *Downs* v. *Commissioner*, 166 F. 2d 504; *Carl H. Thorsell*, 13 T.C. 909; *William B. Cruise*, 12 T.C. 1059; *Dudley A. Chapin*, 9 T.C. 142; *Ralph Love*, 8 T C. 400; and *Arthur J. H. Johnson*, 7 T.C. 1040.

The respondent likens the case of the petitioner Matthew to that of the taxpayer in *Moore* v. *United States*, (S.D. Tex.) 180 F. Supp. 483, affirmed per curiam (C.A. 5) 289 F. 2d 926, in which it was held that the taxpayer was not a bona fide resident of Mexico. There the taxpayer, who was engaged in work in Mexico, provided a home for himself and his family in Texas near the Mexican border and customarily spent 4 days out of every 14, as well as vacations and holidays, with his family there, his work being usually within a radius of 100 miles from the home in Texas. The facts of that case would not justify a conclusion that Moore made his home even temporarily in Mexico, in the sense described hereinabove. Matthew, on the other hand, although owning a home in Florida in which his family lived, settled down at his post of duty for an indefinite time and made his home there temporarily, making periodic temporary visits to his home in Florida. We think the two cases are not parallel.

In view of the foregoing, we conclude that for each of the years in question each petitioner's compensation from Pan American is exempt from tax.

The petitioner Hill also raised the issue of the respondent's disallowance of certain personal exemptions for the years in question. On brief, however, he presses this issue only in the event of an adverse decision on the principal issue. Since we have held that Hill's compensation from Pan American is not taxable (and he had no other income in the years in question), the issue as to his right to deduction of personal exemptions is moot, and we express no opinion with respect thereto.

*Decisions will be entered under Rule 50.*