## WOOD v. GLENN.
### Civ. A. No. 1790.

United States District Court
W. D. Kentucky, at Louisville.
June 7, 1950.

Amended Finding Sept. 18, 1950.

Chas. I. Dawson, Bernard H. Barnett (of Bullitt, Dawson & Tarrant), Louisville, Ky., for plaintiff.

John W. Fisher, Special Assistant to Attorney General, Washington, D. C., David C. Walls, United States Attorney, and Chas. F. Wood, Assistant United States Attorney, Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

This cause coming on for hearing, and the parties having filed a stipulation to the effect that the only question of fact involved is whether or not the plaintiff was a bona fide resident of Costa Rica for the entire calendar year 1943, and for the entire calendar year 1944, within the meaning of Section 116(a) of the Internal Revenue Code, 26 U.S.C.A. § 116(a); and the Court having considered the pleadings, said stipulation, the evidence offered by the parties, and the argument of counsel, and being fully advised, makes and enters the following Findings of Fact, Conclusions of Law and Judgment:

### Findings of Fact

1.

On and prior to September 1, 1942, Ralph E. Mills Company, a Kentucky corporation, was engaged in the business of heavy construction work—such as roads, dams, bridges and the like. Ralph E. Mills, from the inception of the company, was, and now is, its principal stockholder and president; and the plaintiff, Clinton H. Wood, was, and is, also a stockholder and its vice president.

2.

Some time prior to September 1, 1942, the Public Roads Administration of the United States had embarked upon the construction of that portion of the Inter-American Highway, extending from Laredo, Texas, to the Panama Canal, which passes through the Republic of Costa Rica. The Department itself was engaged in the construction of a portion of that highway by force account, the work being under the direct charge and supervision of the United States Corp of Engineers; and, sometime prior to

September, 1942, it entered into negotiations with the Ralph E. Mills Company for that company to construct the remainder of the highway in Costa Rica.

3.

Pursuant to the negotiations mentioned in the preceding numbered finding, on September 1, 1942, two contracts were executed by the Public Roads Administration and Ralph E. Mills Company. By the terms of one of those contracts, Ralph E. Mills Company agreed to construct 20 kilometers (12½ miles) of said highway in accordance with the terms and specifications set out in said contract for the actual cost of construction plus a fixed fee to the Ralph E. Mills Company; and by the terms of the other contract, to construct forty (40) kilometers (25 miles) of said highway in accordance with the terms and specifications set out in that contract for the actual cost of construction plus a fixed fee to Ralph E. Mills Company.

4.

At the time the two contracts referred to in the preceding finding were entered into, it was understood between the Public Roads Administration and Ralph E. Mills Company that as funds became available, the company would be given contracts for the construction of other sections of the road within the boundaries of Costa Rica, to the end that Ralph E. Mills Company would be permitted to construct all of the road within Costa Rica, except that part which was under construction on force account by the Public Roads Administration. As a result of that understanding, the Ralph E. Mills Company and its officials contemplated that its work of construction in Costa Rica would extend over a period of several years. In keeping with that understanding between the Public Roads Administration and Ralph E. Mills Company, a third contract between them was executed on July 24, 1943, covering the construction of 54 kilometers (33¾ miles) of road; and, for the recited purpose of simplifying administration, bookkeeping and the like, there were incorporated in this contract the two prior contracts of September 1, 1942. On October 26, 1943, another contract was entered into between the contracting parties for the construction of an additional 114 kilometers (71¼ miles) of the highway; and finally on June 6, 1944, a fifth contract, covering 16.5 kilometers (10⁵⁄₁₆ miles) of the highway, was entered into by the parties.

5.

It was necessary for Ralph E. Mills Company to have someone constantly on the ground in Costa Rica in charge of the construction work which it had undertaken and expected to do; and the plaintiff, Clinton H. Wood, was selected and employed for that purpose. Among the other terms of his employment was a provision that he should remain in Costa Rica in charge of the work during the entire time it was in progress.

6.

At the time he was employed to go to Costa Rica, the plaintiff's permanent residence or domicile was at Frankfort, Kentucky, at which place he owned a home. This home was closed, and plaintiff left for Costa Rica the early part of September, 1942, arriving there on September 16, 1942; and his wife followed him in November, arriving in Costa Rica on November 18, 1942.

7.

Up until the 4th day of January, 1943, plaintiff and his wife resided at the Europa Hotel, because of their inability prior to that date to rent a home. On the 4th day of January, 1943, they rented a furnished house in San Jose, which belonged to a citizen of Costa Rica. The contract of rental was for a period of six months, this period being fixed by the owner who was unwilling to rent it for a longer period. However, he extended the period of rental from time to time so that the plaintiff and his wife were enabled to occupy that residence as their home for a period of fifteen months. While the house was furnished, the plaintiff and his wife did purchase some dishes, table ware and the like. When their lease terminated on the residence, they rented a partly furnished apartment in San Jose, but they bought bed linens, some furniture and table ware and other items of furnishings and equipment in order to fully

equip the apartment for housekeeping. They retained the apartment until they broke up housekeeping for the purpose of returning to the United States on July 30, 1946.

8.

During the time plaintiff and his wife occupied the private residence and the apartment referred to in the preceding finding, they kept house just as they had prior to the time they left the United States. They employed servants; they entertained, having as their guests citizens and non-citizens of Costa Rica; and they established charge accounts with the stores from which they purchased their groceries, meats and other articles. From early in the first year of their residence, they took an active part in the community life of San Jose. Soon after her arrival, Mrs. Wood joined the Woman's Club, the membership of which was made up of citizens of Costa Rica and persons who were not citizens, but who had resided in that country for some considerable time, one of the members being the wife of the present Vice President of Costa Rica. In 1944, Mrs. Wood was elected Secretary of the Woman's Club, and acted as such. Soon after her arrival, she joined the Garden Club of San Jose, the membership of which was made up of women who were citizens of that country, and women who had been residents for some period. She participated in the flower shows and exhibits conducted by that club. In 1943, she was an exhibitor in the flower show, which was conducted under the auspices of the Secretary of Agriculture of the Republic of Costa Rica, and in 1944 she was also an exhibitor winning second prize for her exhibit. She was also one of the organizers of a library association, the membership of which was composed of persons who were citizens of Costa Rica, and other persons who, like herself, were residing in that country temporarily. That library association was conducted very much like the public library organizations are conducted in this country. Its books were available for the use not only of its members but of any other person willing to pay the fee charged for the privilege, and that privilege was avail-ed of by citizens of San Jose as well as by temporary citizens. Plaintiff and his wife were charter members of the Union Church of San Jose, the membership of which was made up of persons of different denominational faiths. Its membership was composed of persons who were citizens of Costa Rica, as well as persons temporarily residing in that Republic. Plaintiff was Chairman of the Managing Board of that church; Mrs. Wood was Chairman of the Committee on Membership; and they each took an active interest in the affairs of the church.

9.

Page 5 of the passport book issued to plaintiff on the occasion of his first leaving the United States for Costa Rica contained this admonition: "American citizens making their homes or residing for a prolonged period abroad should register at the nearest American consulate." Promptly upon his arrival in San Jose in September, 1942, plaintiff, in accordance with the suggestion contained in his passport book above referred to, went to the American consulate in San Jose and registered.

10.

Under the law of Costa Rica, persons expecting to establish a residence in that republic are required to procure a residence permit, designated as a "cedula de residencia". In accordance with that requirement, plaintiff procured such a permit from the proper authorities of Costa Rica on September 18, 1942. When his wife arrived in San Jose, she registered with the American consulate; and on the 18th day of December, 1942, she also applied for, and was granted a certificate of residence. To obtain a certificate of residence ("cedula de residencia"), in addition to other personal information, the applicant is required to state the expected duration of his residence in Costa Rica. In response to the query as to the expected duration of her residence in Costa Rica, Mrs. Wood stated that it was to extend during the time her husband was engaged in construction work on the Inter-American Highway, and that information was entered in the certificate of residence ("cedula de residencia"). Cer-

4

tificates of residence are issued for one year, renewable from time to time on the application of the holder. The certificates issued to plaintiff and his wife upon their first arrival in Costa Rica, upon their application, were renewed each year from 1943 to 1946, both inclusive.

11.

Anyone intending to engage in business activities in Costa Rica is required to obtain, in addition to a certificate of residence ("cedula de residencia"), a certificate of identification ("cedula de identidad"). In compliance with that requirement, upon arriving in Costa Rica, plaintiff promptly applied for, and had issued to him, such a certificate, identifying his business activities as construction of the Inter-American Highway.

12.

For each of the years 1943, 1944, 1945 and 1946, plaintiff applied for, and had issued to him, a free pass over the electric railway running to the Pacific Coast and over all of its branches, each of said passes being good for one year from the date of its issue.

13.

Shortly after his arrival in Costa Rica, plaintiff was appointed by Ralph E. Mills Company as its Attorney-In-Fact to conduct its business for it in Costa Rica, with power to make contract, sign checks and the like; and that power of attorney was filed and registered with the American Consul in Costa Rica.

14.

In March, 1943, while plaintiff and his wife were living in the private home rented by them as stated in Finding No. 7, he was called back to Kentucky, by Mr. Mills to consult with him concerning the company's affairs in connection with the road work in Costa Rica, and he came back to Kentucky in response to that call. Mrs. Wood remained in Costa Rica in the home which they had established. Plaintiff remained in Kentucky about three weeks; and then returned to his home in Costa Rica. When he left Costa Rica to come to Kentucky, it was his definite intention to return and resume his work as soon as the business

in Kentucky permitted. While in Kentucky, he stayed at a hotel. At the time he returned to Kentucky, he knew that under the law, a resident of the United States could bring into the country articles up to a certain valuation without having to pay duty thereon, but that no such privilege was extended to a non-resident. Notwithstanding that fact, when he arrived at the port of entry, he reported to the Customs authorities that he was a non-resident of the United States.

14-A

In September, 1943, plaintiff and his wife came back to the United States on a vacation, to which plaintiff was entitled under his employment, and also to be present at the graduation of their only son, who was graduating as a member of the war accelerated class at the University of Cincinnati. Plaintiff also expected to consult with his business associates concerning the construction work in Costa Rica, as well as in connection with the business of another company of which he was president. When they left Costa Rica on this trip, they were still residing in the private home rented by them. They did not surrender their lease, nor did they discharge their servants; but they continued to hold their lease, and to pay their servants during their stay in the United States. They left with no intention to leave Costa Rica permanently, but with the full intention of going back to the end that plaintiff might resume his job on the Inter-American Highway. When they arrived in the United States, they reported to the Customs authorities as non-residents and by virtue of that fact, they paid duty on merchandise which they brought with them, on which they would not have been required to pay any duty had they registered as residents of the United States. While in the United States, they occupied their Frankfort, Kentucky, home, which they had left vacant when they first went to Costa Rica, but they uncovered and used only a minimum amount of their furniture and household equipment required to make them comfortable during their stay, but with no intention of resuming their permanent residence in that home at that time. They were in the United

States on this trip approximately thirty days, and then returned to Costa Rica. They went back to the rented residence in which they had been living; plaintiff resumed his work on the highway; and he and his wife resumed their community activities.

### 15.

Neither plaintiff nor his wife was out of Costa Rica during the year 1944.

### 16.

In May, 1945, plaintiff and his wife again returned to the United States for a vacation. When they left Costa Rica on that trip, they retained their rented apartment and their servants, and fully intended, when they left, to return as soon as their vacation was over. Upon their arrival in the United States, they reported to the Customs authorities as non-residents, and as such paid duty on goods which they brought in, in respect of which they would have been required to pay no duty had they registered as residents of the United States. While in the United States, they again occupied their vacant home in Frankfort, under substantially the same circumstances as on their prior trip, but with no intention of resuming their permanent residence in that home at that time. They were in the United States on that trip about thirty days; and upon their return to Costa Rica, they resumed their occupancy of the rented apartment, and continued to occupy same until they finally left Costa Rica on July 31, 1946; and during all of that time plaintiff was engaged in his work in the construction of the Inter-American Highway, and he and his wife in the community activities hereinabove referred to.

### 17.

Due to the fact that appropriations for the construction of the highway had been exhausted, work on the job on which plaintiff was employed was indefinitely suspended in July, 1946, and he and his wife returned to the United States on July 31, 1946

### 18.

The amount involved in the first three contracts referred to in these findings was

approximately \$13,000,000; and the amount involved in all of the contracts, to the extent that they were performed, was approximately \$17,000,000; and approximately 125 miles of road were constructed under the supervision of the plaintiff under those contracts during the period he resided in Costa Rica.

### 19.

From the time of his arrival in Costa Rica in September, 1942, up until the work was finally closed down in 1946, it was the settled purpose and intention of plaintiff to reside in Costa Rica with his wife each year until the construction work on which he was employed was completed; and he actually did so.

### 20.

Plaintiff was not informed as to the tax laws of Costa Rica, but shortly after his first arrival in that country, acting on the advice of the Costa Rican counsel for Ralph E. Mills Company, he signed and filed with the proper authorities an income tax return for the 12 months period extending from October 1, 1941, to October 1, 1942, which had been prepared for him by the company's counsel, but he was informed that he owed no tax on account of that return. He never filed any other income tax returns with the Costa Rica authorities, never paid any tax to that country, and no tax was ever demanded of him.

### 21.

The Court finds as the ultimate fact in this case that the plaintiff was a bona fide resident of Costa Rica for the entire calendar year 1943, and a bona fide resident of Costa Rica for the entire calendar year 1944, within the meaning of Section 116(a) of the Internal Revenue Code.

### Amended Finding No. 1

When the plaintiff established his residence in Costa Rica, he had no intention of permanently abandoning his domicile in Kentucky, but fully intended, upon the completion of his work in Costa Rica, to terminate his residence in that country and re-establish his residence in Kentucky.

6

### Conclusions of Law

By reason of the foregoing Findings of Fact, and by virtue of the provisions of Section 116(a) of the Internal Revenue Code, the Court concludes that the Commissioner of Internal Revenue erroneously included in plaintiff's income subject to taxation by the United States for the calendar years 1943 and 1944, respectively, the compensation paid plaintiff for his services as Project Manager in charge of the construction of the Inter-American Highway in Costa Rica for each of those respective years, and erroneously required him to pay income taxes to the United States on the basis of the inclusion of such compensation in his taxable income for each of said years; and that, therefore, the plaintiff is entitled to the recovery sought in this case.

### Judgment

In accordance with the foregoing Findings of Fact and Conclusions of Law, it is ordered and adjudged that plaintiff recover of the defendant the sum of $1,187.00 on account of taxes and interest improperly collected from him for the calendar year 1943; and the sum of $4,240.28 on account of taxes and interest improperly collected from him for the calendar year 1944; together with interest at the rate of 6% per annum on each of those sums from the 22nd day of November, 1948, to within 30 days of the date check is issued in payment of this judgment; and, further, that he recover his costs in this behalf expended.