## MEALS v. UNITED STATES.
### No. 30921.

United States District Court
N. D. California, S. D.
Feb. 16, 1953.

E. Anderson, Sp. Atty. Bureau of Internal Revenue, San Francisco, Cal., for defendant.

GOODMAN, District Judge.

Plaintiff seeks recovery of $1,559.23 in income tax allegedly erroneously paid on tax-exempt income received during 1946. The income, claimed to be tax exempt, was received from the American Telephone and Telegraph Company for services performed by plaintiff during 1946 in Germany. Such income, plaintiff urges, was then exempt from taxation by Section 116(a) (1) of the Internal Revenue Code, 26 U.S.C. § 116(a) (1).[1] At that time, Section 116(a) (1) exempted from taxation earned income, received from sources without the United States, by a citizen of the United States, who was a bona fide resident of a foreign country during the entire taxable year.

The Government concedes that if plaintiff were a bona fide resident of Germany during 1946, his earnings there were tax exempt. But, although it is not disputed that plaintiff was physically present in Germany during all of 1946, the Government denies that he acquired such a residence there as was contemplated by Section 116(a) (1).

The term "bona fide resident" is not statutorily defined. The Treasury has attempted to define the term by regulation. Treasury Regulation 111, 26 C.F.R. 29.116–1 states that whether an individual citizen of the United States is a bona fide resident of a foreign country shall be determined in general by the application of the principles relating to what constitutes residence or nonresidence in the United States in the case of an alien. The regulation delineat-

Richard O. Graw, San Francisco, Cal., for plaintiff.

Chauncey Tramutolo, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., and Paul

1. In 1946 Section 116(a) (1) read as follows:

§ 116. *Exclusions from gross income*

"In addition to the items specified in section 22(b), the following items shall not be included in gross income and shall be exempt from taxation under this chapter:

"(a) *Earned income from sources without the United States.*

"(1) *Foreign residence for entire taxable year.* In the case of an individual citizen of the United States, who establishes to the satisfaction of the Commissioner that he is a bona fide resident of a foreign country or countries during the entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income as defined in paragraph (3); but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection."

ing the principles for determining the residential status of aliens in the United States reads in material part as follows:

"An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances. 26 C.F.R. 29.211–2(b)."

This regulation constitutes only a very general guide to the meaning of the term "bona fide resident." A fuller understanding of the sense in which the term was used in Section 116(a) (1) must be derived from the history and purpose of the tax

exemption accorded United States citizens living abroad. Such an exemption was first granted by the Revenue Act of 1926, 44 Stat. 9. It was prompted by the desire of the Congress to promote our foreign trade by providing an incentive for American businessmen to enter that field. The exemption was given, at that time, to citizens of the United States who were bona fide nonresidents of the United States for more than six months during the taxable year. Mere physical absence from the United States for more than six months during the taxable year sufficed to qualify.[2]

As tax rates rose, this liberal exemption induced many Americans to absent themselves from the country solely to reduce their income taxes. By 1942, abuse of the exemption led the House of Representatives to provide for its repeal in the revenue bill for that year. After hearings on the subject, the Senate Committee on Finance proposed, in lieu of repeal, to limit the exemption to persons who were bona fide residents of a foreign country during the taxable year. The Congress accepted this proposal. It became part of the Revenue Act of 1942, 56 Stat. 798, 841, and remained in this form until 1951.[3]

The Senate Committee on Finance reported that it had formulated the limited exemption because it had been convinced by cases brought to its attention that complete elimination of the exemption would work a hardship on United States citizens who were bona fide residents of foreign countries.[4] The potential hardship cases, which prompted the Committee action, exemplify the kind of foreign residence envisioned by the Committee when it employed the term "bona fide resident." These

2. See Commissioner v. Fiske's Estate, 7 Cir., 1942, 128 F.2d 487.

3. The Revenue Act of 1951, 65 Stat. 452, added an alternative qualification for the exemption. Section 321 of that Act provided that there shall be excluded from gross income "In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (ex-

cept amounts paid by the United States or any agency thereof) if such amounts constitute earned income .(as defined in paragraph (3)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this paragraph." 26 U.S.C. § 116(a) (2).

4. Senate Report 1631, 77th Congress, 2nd Session.

illustrative cases considered at the Committee hearings fell into general pattern.[5] They pictured a citizen who had established a home abroad in order to compete in foreign markets for goods or services. He had so far assimilated himself in the foreign life that he was confronted with expenses uncommon to residents of the United States. To maintain a standard of living comparable to that in the United States cost him more in countries where the prevailing standard was lower. Poor sanitation facilities increased his medical expenses. He found it necessary to send his children to private schools at his own expense. The desirability of maintaining social and business contacts in the United States occasioned high travel expense. In many instances, he was required to pay an income tax to the country of his residence. And, even where no income tax was levied, his taxes were frequently heavy because a higher proportion of total taxation in many foreign countries is represented by various indirect taxes than in the United States.

In determining the form of tax relief to be accorded Americans living abroad, the Senate Committee was confronted with these various facets of foreign life which make the living costs of the foreign resident higher than those of his fellow citizens at home. The Committee might have granted tax credits or deductions for the unique expenses entailed by citizens living abroad. Instead, it took the broader approach of exempting from income taxation the foreign earnings of all citizens who are bona fide residents of a foreign country. It is apparent that the Committee did not intend that any single aspect of a citizen's life in a foreign country should determine whether he was a bona fide resident there. The Committee sought to embrace in the term "bona fide resident" all whose assimilation into the foreign life was sufficient to expose them to the burdens of adjusting to the foreign environment.

Viewing the entire picture of plaintiff's life in Germany in the light of the Congressional objective, it is clear that plaintiff was a bona fide resident of a foreign country during 1946 within the meaning of the exemption statute. The Government's contrary conclusion stems from placing undue emphasis upon isolated and special aspects of plaintiff's life abroad.

In 1945, just prior to the acceptance of employment in Germany, plaintiff was working in the Foreign Service Department of the American Telephone and Telegraph Company in California. He was a radioman assigned to the operation of overseas circuits to Pacific points. Late in 1945, the Company offered him employment in Germany where it was establishing an overseas communication system. The communications system contemplated by the Company for Germany was not a temporary installation, but a permanent one in the sense that it would be maintained and expanded so long as business conditions warranted. It was expected that initially plaintiff's work in Germany would be similar to that which he had done in California, but that his duties would grow in importance as he gained in experience and the Company's operations in Germany expanded. The duration of the proffered employment was unlimited.

Plaintiff was then unmarried. Upon accepting the position in Germany, he gave up the rented room in which he had been living in Berkeley, California. Such of his belongings as could be carried by plane, he took with him, and the remainder was thereafter sent to him by a friend.

He arrived in Germany early in December, 1945. For several months he was occupied in putting into working condition the equipment at the Company's transmitting station near Frankfort. His next task was to supervise German personnel at the receiving station. Thereafter he gave a course in carrier telegraphy to the German personnel. Then he worked on the main switchboard connecting the overseas system with various German cities. Finally, he was placed in charge of the entire overseas-communication plant.

Although certain of the equipment used in the overseas-communication system was leased from the American Army, the sys-

5. Hearings of the Senate Committee on Finance on H.R. 7378, 77th Congress, 2nd Session, Vol. 1, pages 733–775.

tem was a private profit-making enterprise. Occasionally official U. S. Army messages were transmitted over the system, but the Army maintained its own overseas communication circuits. When the Company system first went into operation its limited facilities were restricted to American and Allied civilian and military personnel working in Germany. As the system expanded, service was extended to the German population. Plaintiff considered the future development of the system so promising that during 1946 he and several co-workers sought, unsuccessfully, to acquire the system from the American Telephone and Telegraph Company.

During the time that plaintiff lived in Germany, he maintained his own apartment in an apartment house in Frankfort. This apartment house had been taken over by the United States Army and the apartments were rented by the Army to American civilian and military personnel as well as to Allied civilian personnel. Plaintiff entered into the social life of the community, entertaining both Americans and Germans at his apartment. Plaintiff's movements were not restricted by military regulations.

In March of 1947, he became engaged to a German girl whom he had first met the previous May. They were married in June, of 1947. The regulations of the Military Government for Germany then prohibited Americans who married Germans from remaining in Germany more than 30 days after the marriage. Consequently, plaintiff was forced to give up his employment in Germany, and he returned with his bride to the United States in July, 1947. The termination of his employment in Germany represented a change in plans. He was not aware of the military regulation applicable to Americans who married Germans until February, 1947. And, it was not until he became engaged the next month that he began planning for the abandonment rather than the continuance of his work in Germany.

The whole pattern of plaintiff's life in Germany is consistent with his claim of residence there. He went to Germany planning to remain there for a substantial and indefinite period of time. He was embarking upon employment which promised to develop into a career. He abandoned entirely the home he had previously maintained in the United States. The apartment he established in Frankfort was a home as complete as most bachelors ever achieve. He worked with German personnel, and entered into the social life of the community to such extent that he married a German girl. The only features of his life that set him apart from the German scene were the courtesies the Army extended to him as an American civilian employed in Germany. He was privileged to buy supplies at the Army Post-Exchange. He occasionally purchased meals at an Army mess. The apartment made available to him by the Army probably afforded him more comfortable living quarters than would otherwise have been obtainable. But, these special privileges which he enjoyed as an American did not isolate him from the foreign environment to such extent as to preclude the establishment of a bona fide residence.

Certain other features of plaintiff's life in Germany which the Government contends are inconsistent with bona fide residence there warrant comment. The Government emphasizes most strongly that plaintiff did not pay a German income tax. But, the failure of an American to pay income tax to a foreign country in which he is living is of little significance in determining whether he is a bona fide resident there. The exemption of the earnings of a citizen resident in a foreign country from income taxation was not motivated by the desire to eliminate the possibility of a double-tax on the same income. For other provisions of the Internal Revenue Code specifically allow as a credit against income tax due the United States such income tax as has been paid to any foreign country.[6] Furthermore, in formulating the exemption, the Congressional Committee was well aware that some foreign countries levy income taxes while others do not. And, as

_____

6. 26 U.S.C. § 131(a) (1).

has been mentioned, the Committee was apprised of the fact that in many foreign countries a much greater proportion of total taxation is represented by various indirect taxes borne by persons living there than in the United States.[7]

The Government also notes that plaintiff was reimbursed by his employer for expenses incurred for living quarters and food in Germany. This also has little bearing on the character of plaintiff's residence in Germany. In providing the tax relief afforded by the income tax exemption, the Congress was not solely concerned with the effect which higher living costs abroad had upon the individual employee. It had been pointed out to the Congress that high living costs abroad are reflected in the salary or the subsistence allowance paid to employees, and that such costs are ultimately borne by the employer.[8] The tax exemption enables American businessmen abroad to attract American employees by lower salaries than would otherwise be possible, and encourages them to hire American rather than native personnel. Thus, the fact that an American employee abroad is reimbursed for his living expenses by his employer is not a reason for denying him the tax exemption intended by the Congress to encourage his employment.

■ Significance is placed by the Government on the fact that plaintiff maintained his bank account in the United States rather than in Germany. However, it is common knowledge that the German financial system was disrupted following the war. Under these circumstances, plaintiff's decision not to transfer his account to a German bank is not inconsistent with his claim of a bona fide residence in Germany.

■ Finally, the Government points out that plaintiff never applied for German citizenship. This fact is utterly immaterial. The tax exemption was designed for American citizens. It was intended to encourage them to develop American enterprises abroad, not to transfer their allegiance to a foreign state.

The Government has characterized plaintiff's case as analogous to the so-called "war-worker" cases in which the courts have rejected the claim of bona fide residence.[9] Some of those cases have some facts in common with the present case. But, a comparative analysis of each point of similarity and difference would serve no purpose. It is sufficient to note that the "war-worker" cases dealt with persons who had gone abroad for some specific purpose incident to the war effort. Many of them left families in the United States. The duration of their employment abroad was limited by contract or by the duration of the war. Limited visas also generally restricted their activity abroad both in nature and duration to the specific purpose they went to accomplish. Most of these workers worked and lived on military bases. Their movements were severely circumscribed by war-time regulations. The total factual picture in the war-worker cases is vastly different from that in the present case.

The same thing may be said of the cases rejecting the claims of technicians to bona fide residence in various remote areas of the world.[10] These technicians contracted to work abroad for specific periods of time or to complete specific projects. Many of them left families in the United States. All of the necessities of life were supplied

---

7. Hearings of the Senate Committee on Finance on H.R. 7378, 77th Congress, 2nd Session, Vol. 1, pages 745, 746, 749, 752, 757, 775.

8. Hearings of the Senate Committee on Finance on H.R. 7378, 77th Congress, 2nd Session, Vol. 1, pages 754, 755, 756, 758, 762, 765, 766, 772.

9. Downs v. Commissioner, 9 Cir., 1948, 166 F.2d 504; James L. Wynekoop, 10 CCH T.C.M. 380, par. 18,279(M) (1951); Thorsell, 1949, 13 T.C. 909; Cruise, 1949, 12 T.C. 1059; Chapin, 1947, 9 T.C. 142; Love, 1947, 8 T.C. 400; Johnson, 1946, 7 T.C. 1040; Torkel Nesland, 5 CCH T.C.M. 890, par. 15,444(M) (1946).

10. Jones v. Kyle, 10 Cir., 1951, 190 F.2d 353; Meso v. Viley, D.C.Idaho 1952, 102 F.Supp. 173; Evans v. United States, D.C.N.D.Cal.1951, 101 F.Supp. 564; Len Sampson Crane, 11 CCH T.C.M. 516, par. 18,992(M) (1952); Weeks, 1951, 16 T.C. 248; Arthur W. Noyes, 10 CCH T.C.M. 294, par. 18,224(M) (1951).

664

to them by their employer. They lived in barracks isolated from the foreign community.

The cases cited by plaintiff[11] wherein the claim of bona fide residence in a foreign country was sustained are more analogous to this case than any of the cases relied upon by the Government.

Judgment for plaintiff. Present findings pursuant to the rules.

11. Seeley v. Commissioner, 2 Cir., 1951, 186 F.2d 541; Myers v. Commissioner, 4 Cir., 1950, 180 F.2d 969; Swenson v. Thomas, 5 Cir., 1947, 164 F.2d 783; Wood v. Glenn, D.C.Ky. 1950, 92 F. Supp. 1; White v. Hofferbert, D.C.Md. 1950, 88 F.Supp. 457; Yaross v. Krae-mer, D.C.Conn.1949, 83 F.Supp. 411; Rose, 1951, 16 T.C. 232; Howard E. Powell, 10 CCH T.C.M. 928, par. 18,565(M) (1951); Baehre, 1950, 15 T.C. 236; Harvey, 1948, 10 T.C. 183; Bouldin, 1947, 8 T.C. 959.