*Decision will be entered under Rule 50.*

RICHARD W. BENFER AND ELAINE P. BENFER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3629–64. Filed December 20, 1965.

278

*Alan C. Kay*, for the petitioners.

*Wesley A. Dierberger*, for the respondent.

TIETJENS, *Judge:* The respondent determined a deficiency in petitioners' income tax for 1961 in the amount of $8,018.16. The sole issue is whether petitioners were bona fide residents of a foreign country within the meaning of section 911(a)(1), I.R.C. 1954.

On brief, respondent conceded that, for the purposes of this case, Kwajalein, Marshall Islands, is a "foreign country" within the meaning of section 911, *supra.* On brief, respondent also conceded petitioners' alternative issue, viz, that petitioners are entitled to exclude $9,315.06 of their 1961 income under the provisions of section 911(a)(2) of the 1954 Code.

FINDINGS OF FACT

The stipulated facts are found as stipulated.

The petitioners, husband and wife, filed their joint 1961 Federal income tax return, Form 1040, with the District Director of International Operations, Washington, D.C. On their return, they excluded from income $27,000 in salary earned by Richard W. Benfer from the Bell Telephone Laboratories upon the ground that this amount had been earned by him while a bona fide resident of a foreign country. Attached to their joint return was Form 2555 which sets forth a statement in support of their exclusion of income earned abroad. The term "petitioner," as used herein, refers to Richard W. Benfer.

In June 1929, petitioner graduated from the University of Illinois. In July 1929, he became an employee of Western Electric Co., part of the Bell System. Since that time he has continued to be an employee of the Bell System. He worked in New York City for about 10 years as a design engineer in radio and sound movie fields. Late in 1939, Western Electric transferred him to its Los Angeles office, where he worked with the same type of equipment as a supervisor.

Shortly after December 7, 1941, Benfer was transferred to the Bell Telephone Laboratories, Whippany, N.J., for fire control and radar equipment design for the Armed Forces. Petitioner remained at Whippany for the duration of the war and thereafter, working 7 days a week. His work assignments were all within the United States. At the end of the war petitioner rented a house in New Jersey and continued in military type activities at Whippany.

In 1947, petitioner was assigned to the Nike series of defense weapons and thereafter worked on that project. There are a series of missiles in the Nike family: Nike-Ajax, Nike-Zeus, and Nike-Hercules. The petitioner has worked on all of them. The Nike-Ajax missile has been phased out but Bell Laboratories is still supporting tests on Nike-

Hercules at its White Sands Laboratory, Las Cruces, N. Mex., and is working on an advanced system known as Nike-X. Bell Laboratories has experimental stations at White Sands, several in New Jersey, the Pacific Missile Range on the west coast, and at Kwajalein, Marshall Islands.

In September 1953, petitioner was promoted to director of Bell's White Sands Laboratory which was being started for the purpose of testing missiles on the White Sands Missile Range. Petitioner was director of White Sands Laboratory until he was appointed director of Bell's Kwajalein Field Station, Kwajalein, Marshall Islands, effective October 1, 1960. He bought a house in Las Cruces in 1953.

Petitioner did not volunteer for the Kwajalein assignment. He was consulted about the assignment, was assigned to it, and accepted the position as an assignment. He received no written contract from his employer for the assignment, and he has no written contract now as this is not the policy of his employer. His assignment at Kwajalein was indefinite, a minimum of at least 3 or 4 years. His employer did not know when he would return from Kwajalein or what his next assignment would be. The programing at Kwajalein has continued yearly with no termination date in sight and with existing programs extending operations at Kwajalein to 1969 or 1970.

The Kwajalein project was an extension of the land range activities at White Sands. Petitioner's job was to establish Bell's research station on Kwajalein, get it operational, and conduct the test program. He participated in all negotiations for the test planning of the program. The first phase was participating with the people contracting to rehabilitate the island, install and prepare sites for radar and missile facilities for test purposes, and set up proper office and laboratory facilities and staff.

The site was scheduled to be operational by the middle of 1962, and this was accomplished. It took approximately 18 months to prepare the site for operational tests. This period of 18 months was devoted to construction of facilities, site preparations, installations of equipment, checkout, and preparing for operational tests. Thereafter, operational tests were conducted with the gear installed. Simultaneously therewith, additional gear was installed and sites prepared for additional equipment for further operational tests with the result that the operation was a continuous process.

Bell Laboratories' participation in the Nike contract was research and development of the Nike systems, not manufacturing or operation of the defense system as a weapon. Nike-Zeus was the only system in Kwajalein while petitioner was there. The Nike-Zeus missile, with its accompanying system, which is a complex of radars and computers, is capable of intercepting an ICBM missile on its terminal trajectory. It is a missile that has been developed over a period of

years and initially tested at the White Sands Missile Range. The accompanying equipment had been tested partially at the White Sands Missile Range, and such testing was continued at the Kwajalein test site.

Bell Laboratories does not make the rocket. It is made by Douglas Aircraft Co. Bell's connection with the rocket on Kwajalein is as follows: The Department of the Army contracts with Western Electric and Bell Telephone Laboratories, the Bell System, as a system developer. Douglas Aircraft is a subcontractor to Bell Laboratories. The contracting officers of Bell Laboratories look to Bell as the prime contractor for the weapons system regardless of what it takes to do it, and Bell Laboratories subcontracts for things like missiles, but controls and has full responsibility for the development of the system. The Douglas Aircraft people and the other technical people on Kwajalein were subcontractors to Bell Telephone Laboratories and worked for Bell.

After the site became operational petitioner had about 600 people working for him in specific authorized activities. He was under day-to-day supervision of his Bell director at Whippany, but was responsible to no one at Kwajalein. Among the firms, agencies, institutions, and others operating and having employees on or near Kwajalein were the following:

The only Air Force officer on the Island known to petitioner was with MATS.

The Transport Co. of Texas was the logistic contractor that provided the island facilities. It ran the schools, the hospital, the doctors, and the school teachers. It operated the housing facilities as part of its contract to provide basic housing without charge to employees. It was a contractor to the Navy Department.

Army Rocket Guided Missile Agency (ARGMA), now Army Materiel Command (AMC), located at Huntsville, Ala., Redstone Arsenal, is the contracting officer with technical cognizance over the scope of the contract. It funds the contract and determines the scope of the technical research activities. At any site where petitioner is working, or at Bell's headquarters office, ARGMA has certain resident liaison people, some contract type and some technical type people, who are supposed to see that Bell runs the contract in accordance with Government regulations. They are contract monitors. ARGMA does not run or shoot the missile. Its personnel on Kwajalein consisted of a half dozen officers and three civil service employees during 1960 and 1961.

American Electric Co. of Honolulu, the electrical contractor on the island, had employees on Kwajalein, the number of which varied with the level of work.

During 1961, Douglas Aircraft Co. had approximately 100 employees there.

Kentron, Hawaii, had employees there in 1961 who provided technical support for instrumentation on the range.

Lincoln Laboratories and MIT had an installation on the Island of Roi. Part of their technical staff resided on Kwajalein although they worked at Roi.

New Mexico State, one of Bell's subcontractors, provided data analysts and handlers.

Pacific Martin-Zachry, a contractor, had civilian employees doing construction work in the Pacific area.

Remington Rand, a subcontractor to Bell, had a half dozen computer programer people on Kwajalein.

The U.S. Army Corps of Engineers and its contractors were on Kwajalein. They prepared the site and constructed the buildings and facilities used by Bell.

In view of the instructions from his employer at the time he accepted the Kwajalein assignment, petitioner decided to sell his house in Las Cruces, since he did not know when he would return. In October or November of 1960, petitioner offered his house and two cars (one being his wife's) for sale. The cars were sold, but the sale of the house was delayed until July of 1961 because petitioner could not get the price he thought he should have for the property. Petitioner sold the house for approximately $3,300 less than he paid for it new in 1953. In addition, he had expended approximately $3,000 on improvements, such as landscaping, the addition of a patio and a carport, and air conditioning.

Petitioner was a member of a country club in Las Cruces. He resigned therefrom in October or November of 1960 as a result of his new assignment.

Petitioner's wife did not accompany him to Kwajalein. She remained in Las Cruces to clean up their affairs and also because residential quarters on Kwajalein were not yet completed and rehabilitated. Petitioner's quarters were ready late in November, but their affairs in Las Cruces were still unsettled. It being just prior to Christmas, petitioner and his wife agreed that she would join him after the holidays. Petitioner's wife stayed at their house in Las Cruces until it was sold although a good many of their possessions had already been packed, sold, or stored.

Petitioner's wife was unable to join him on Kwajalein immediately after the house was sold. Prior to such sale and upon the insistence of her doctor, she had to plan to undergo surgery. She and petitioner agreed that the operation should be performed in an El Paso hospital where her doctors were familiar with her case. Before under-

going surgery, petitioner's wife shipped the family dog via commercial airlines through Honolulu quarantine to Kwajalein. The dog arrived in Kwajalein late in the spring or early in the summer of 1961. After the operation petitioner's wife convalesced with his family in Long Island, N.Y., and then joined petitioner on Kwajalein on October 4, 1961. Petitioner has no children.

Petitioner's wife was not employed at the time they left Las Cruces. On or about November 1, 1961, she commenced working as a part-time sales clerk in a store for the Transport Co. of Texas and worked in Kwajalein during the remaining 2 months of 1961. On the 1961 joint return she reported as wages received, $281.41, and income tax withheld, $51.30.

Petitioner shipped a minimum of his household goods to Kwajalein as housing on the island was provided by the Transport Co. of Texas and was adequately furnished with a rattan type of furniture that would survive the tropics. The goods shipped were linens, silver, appliances, personal clothing, and little items that women utilize to make a place look like home, largely personal possessions exclusive of fixed furniture.

Kwajalein is located in the Pacific Ocean approximately 2,160 nautical miles southwest of Honolulu, Hawaii, 1,430 miles southwest of Johnston Island, and 650 miles south of Wake Island. It is approximately 8° north of the equator and 167° east longitude. Its calendar is 1 day ahead of the date of the United States. It is 7 hours earlier than New York eastern standard time and 2 hours earlier than Hawaiian standard time.

The Island of Kwajalein is approximately 2.6 miles long, 0.3 of a mile wide, and shaped like a boomerang. Its area is 0.8 square miles with an average elevation of 7 feet and a maximum elevation of 12 feet above sea level. It is the largest of the several small islands of the Kwajalein Atoll, a part of the west central Marshall Islands. The population consists of from 3,000 to 3,500 people.

After World War II the U.S. Navy assumed control of Kwajalein. Effective July 18, 1947, a trusteeship agreement was entered into between the United States and the United Nations under which the U.S. Department of the Interior, by virtue of certain Executive orders, administers to all of the Marshall Islands (including Kwajalein) as a part of the Pacific Trust Territories. The Honorable M. W. Goding is the High Commissioner of the Trust Territories of the Pacific Islands with offices at Saipan, Marianas Islands. The provisions of the trusteeship agreement are incorporated herein by reference.

The commanding officer of the U.S. Pacific Missile Range Facility is the military commander on Kwajalein. He is also the civil administrator of the island as well as a commander of military personnel.

During petitioner's stay on Kwajalein the military commander and administrator was a Navy captain with a modest staff of officers. Petitioner did not have to report to the Navy in any capacity, and the Navy had nothing to do with his presence on Kwajalein. Petitioner was not familiar with the political structure and arrangements between the trust territory and the Secretary of the Interior.

The Pacific Missile Range Facility was the name under which the Navy was operating the West Coast Range. The West Coast Range included the land-based complex at Vandenberg, Point Arguello, and Point Mugu, places along the West Coast of California that used the Pacific Ocean as a missile range.

Kwajalein did not resemble a military base. It had no military police. It was a civilian-manned island with only civilian police. Along with all civilian occupants, petitioners were subject to the laws of the trust territory which were imposed by the United States as the administering authority under the trusteeship agreement. If a crime were committed on the island, the person would have to appear before a representative of the Marshallese Island District Court. A more serious crime would be heard at Masuro, an island approximately 300 miles away, or, under the worst conditions, it would go to Truk.

Section 662, chapter 10 of the Code of the Trust Territory, provides that "no person shall enter or remain as a permanent resident unless so authorized by the High Commissioner." Petitioner was unaware of this requirement of the Code of the Trust Territory. Neither Richard nor Elaine Benfer filed a request with the High Commissioner for permanent residency on the island.

It is essential that all personnel going to Kwajalein have in their possession documentary proof of their citizenship and evidence of affiliation with the company by whom employed. Personnel going to Kwajalein must submit to security clearance requirements of the U.S. Defense Department. Each company and individual was responsible for compliance with security regulations. The security requirements on Kwajalein were as follows:

SECRET—Required of all persons having access to schedules, technical data, system performance, or operational information related to the Nike-Zeus System.

CONFIDENTIAL—Required of support personnel not directly associated with system tests or technical operations. Persons in this category may be considered to be building maintenance, repairmen, power station operators, janitors, etc.

However, security clearance was not required for admission to the island. Many people present on Kwajalein at one time or another did not have security clearance. It was only required for admission to certain portions of petitioner's activities which were classified. Construction contractors required no security clearance as they had no access to classified material or places.

Petitioner had security clearance during the war. His security clearance had been established at headquarters since 1947, and he had security clearance when he first arrived at White Sands. It was unnecessary for him to obtain any different or new type of clearance when he went to Kwajalein. All of petitioner's employees have had security clearance continuously for many years. Petitioner would not take or send any employee to Kwajalein who was not properly cleared for the technical services he was to perform. If he became suspicious of one of his employees, he would remove him, report it to headquarters of Bell and to the proper security people.

Petitioner had complete freedom to go wherever he wanted to go on Kwajalein. Petitioner's wife could also move about freely as did other family members within the limitations of equipment security. When such persons were conducted through the office buildings or through any of the facilities, it was done on a nonclassified basis. The radars and the radar buildings were off limits except to those with Secret or Confidential security clearances. Other than that, there were no restrictions around the island and the children could play anywhere.

Petitioner found Kwajalein a pleasant place to live with a nice community. Most of his employees were surprised at the pleasant facilities and community life that had been established on the island. Although petitioner received free housing and basic furniture, everything else was at his own expense. The existence of idle housing and its availability was one reason for selecting Kwajalein as a missile range site. The logistic contractor was given the job of refurbishing the existing houses and furnishing them with basic furniture, a stove, and a refrigerator. The number of families on the island was limited by the available housing. At the time of petitioner's residence, there were between 500 and 600 family housing units on the island which were full and remained full.

Petitioner lived in assigned quarters consisting of a two-bedroom and den separate unit. He and his wife were required to do considerable entertaining. He moved into the house in November 1960 occupying it as a bachelor. Prior thereto, he stayed in temporary quarters on his first few arrivals as he had to travel back and forth from Kwajalein to the United States in making arrangements for the Bell project.

The house assigned to petitioner was not air conditioned. At his own expense he air conditioned the house, and bought an automatic dishwasher and dryer, and some other things like lanai furniture. He made these additions because he felt that he was going to be there long enough to justify their acquisition and use. Petitioner hired a Mar-

shallese yard boy to take care of his yard and a Marshallese maid for his wife.

Petitioner's social life on Kwajalein was a little more vigorous and active than it had been in Las Cruces. The people composed an intimate group, and there were frequent visitors going through Kwajalein, such as Government visitors, military visitors, United Nations committees, inspection teams, annual inspection teams from the United Nations, and visitors from the trust territory districts.

Petitioner attended social functions that Marshallese people also attended. Many social functions were joint, particularly when representatives of the United Nations would stop on one of their tours of the entire trust territories. There were committees with chairmen making annual tours. One committee had the President of Bolivia as its chairman. Petitioner, and several others on the island, entertained them at the club and at their respective houses on several occasions. There were also many of petitioner's project people on short visits for business purposes who were entertained.

Petitioner participated in Boy Scout activity on the island, in a management capacity, by helping to support it, get it going, and negotiating in its behalf. He corresponded with the Aloha Council in negotiating for and establishing recognized Scout activities. He arranged transportation on the company airplane for the Boy Scout representative in Honolulu to visit Kwajalein occasionally. He did not become a scoutmaster, but some of his qualified employees did.

Petitioner helped support the Little Theater which may have started after 1961. He supported it from a management point of view by authorizing and donating facilities and other things. He did not participate as a member of the Little Theater troupe, but purchased tickets and attended their performances.

There was a chapel on the island with two Protestant ministers, a Catholic priest, and occasionally a Jewish rabbi. Petitioner, an Episcopalian, attended the Episcopal services but was not personally active in any functions of the church.

The schools on the island consisted of a nursery and kindergarten school, an elementary school through the 10th grade, and a high school.

The stores on the island consisted of a general store which contained all the durable goods and necessities, a second store that supplied food and groceries, which was operated by the same management but as a separate store, and a third store which provided liquor. The general store was stocked out of Oakland, Calif., with prices slightly higher than mainland prices. Ships supplied the island every 2 weeks and the stores were well stocked. The shipping service was adequate and there was never any hardship.

There were four or five types of clubs on the island, which, by membership were: A club for the family management type of rank, two bachelor clubs, and a mixture of clubs and restaurants.

There were four movie theaters on Kwajalein. One was for children only, one was in the family area, and two were in the bachelor area. They were small and rotated the same material between them every week.

The facilities on the island for recreation included a playground, tennis courts, bowling alleys, and two swimming pools. A golf course was completed in mid or late 1962. There were motor boats for water skiing and larger boats for deep sea fishing. These were available to all residents on a first-come-first-served reservation type of business. There was a Little League, a softball, and a baseball league.

In addition to the Boy Scouts and the Little League, which were the only national type of organizations on the island, the youth movements included scuba diving, shell hunting, and snorkel expeditions to one of the adjoining islands over the weekend with adult sponsors, training clubs organized for small children to teach them sailing with small class boats, and Girl Scouts and Brownies later on.

Other community facilities on the island included the hospital, previously mentioned, a local radio station, a daily newspaper published on the island, a library and hobby shop, a telephone system with dial exchange, a Kwajalein branch of the Bank of Hawaii, a hotel, and a post office. Mail was addressed to petitioner at Navy 824, Box 141, % FPO, San Francisco.

Unless otherwise indicated, all of the foregoing facilities were available throughout petitioner's stay on the island. He contributed to local activities, the Boy Scouts, and his church, but did not claim these contributions as deductions on the 1961 joint income tax return of himself and wife. The only contributions claimed on such return were the following: American Overseas Campaign—$30; University of Illinois Foundation—$15; and Dona Ana County Humane Society—$5.

Upon his arrival on Kwajalein, petitioner opened a checking account with the local branch of the Bank of Hawaii, transferring his checking account from his bank in Las Cruces, N. Mex. After his wife arrived they opened a savings account in addition to the checking account. During the taxable year, petitioner also had a joint savings account with his wife in First National Bank of Las Cruces, an investment fund in Mutual Savings & Loan Association of Las Cruces, a bank account with the Greenwich Savings Bank in New York City, and a checking account in the National Bank of Westchester.

Some several hundred Marshallese are employed on Kwajalein between 8 a.m. and 4 p.m., but all natives are returned to one of the other adjacent islands every night.

When he was assigned to Kwajalein petitioner had many discussions with management and company counsel on the income tax laws and the laws of the trust territory regarding any tax liability at Kwajalein. He was fully aware of the alternatives given in the tax law and was familiar with the instructions provided for U.S. citizens abroad. He was also aware that because of the necessity for him to travel in the early days in negotiating and performing his job as manager and director, that he might not qualify under the 510-day provision of the Code. He was prepared to file his income tax return as a bona fide resident, with the knowledge of the company counsel, who felt that the conditions of petitioner's assignment made it valid for him to file as a bona fide resident. This advice by the house counsel was given to petitioner in 1960 before he left for Kwajalein.

During 1961 petitioner considered Kwajalein as his home, and his residence on the island as living in a foreign country. In 1961, 1962, and 1963 he claimed an exclusion as a bona fide resident of a foreign country.

Since petitioner began paying income tax in 1930, it has been his practice to follow the pay-as-you-go plan and have his employer withhold from his salary on a quarterly basis more than the legal withholding so that the amount withheld would cover his estimated tax. He elected to continue this practice when he went to Kwajalein for the reason that he approved of the pay-as-you-go plan. Also, in the event that something suddenly happened to him, accidentally or healthwise, thus terminating his tour on Kwajalein, he did not want his wife to be faced with trying to liquidate assets to pay income tax that he might owe. He was aware that he could have had his employer cease withholding income taxes for the reason that he was claiming an exemption as a bona fide resident of a foreign country and also under the 510-day rule.

Petitioner was paid a salary of $27,000 in 1961 for his employment on Kwajalein. He received the standard 25-percent overseas pay, which is included in the $27,000. He did not receive a raise when he went to Kwajalein. In 1960 he earned less than $27,000.

Petitioner paid no income or other tax for 1961 to the Federal Government or any other governmental body because of his presence on Kwajalein in 1961. The trust territory does not assess any tax against anyone.

The Internal Revenue Service refunded to petitioner a portion of the 1963 moneys withheld, prorated for the time he spent at Kwajalein.

Petitioner arrived in Kwajalein on October 5, 1960. From October 1960 to August 1961, he made six business trips to the United States in the interests of the Kwajalein project, negotiating for people and facilities, planning, and so forth. His conferences were held on the west coast, the east coast, at White Sands, and at Huntsville, Ala. Two of these trips combined business conferences with assistance to his wife in connection with her illness and operation.

Petitioner left Kwajalein on August 10, 1963. He returned to White Sands to resume his former position as director of the White Sands Laboratory. His return was a decision on the part of management. There were some changes in management and personnel and petitioner's executive director asked him to resume his post at White Sands in September 1963 and petitioner agreed. The man who had replaced petitioner at White Sands in 1960 was required back at headquarters for a new development program. Petitioner's replacement on Kwajalein arrived the day before he left. The shift in jobs involved no promotion, nor did it mean that the job on Kwajalein had been completed.

Petitioner's assignment to White Sands in 1963 was for an indefinite period. He could be sent to any of the Bell System's locations at any time and could possibly resume his position at Kwajalein.

In determining the deficiency for 1961, respondent advised petitioners as follows: "The amount of the deficiency shown herein is subject to adjustment for a prepayment credit in the amount of $7,919.92 for which you claimed a refund, but which has not been refunded to you." The adjustments made by respondent were: The increase of income by $27,000, the disallowance of itemized deductions of $650.21, and the allowance of a standard deduction of $1,000. By these adjustments, petitioners' taxable income was increased from the $538.64 disclosed on their return to $27,188.85 as determined by respondent. The income tax liability on this taxable income was computed by respondent as $8,104.34, petitioners were credited with $86.18 from their original return, and a statutory deficiency of $8,018.16 was determined. Respondent then credited the petitioners with "overpayment claimed (not refunded)" in the amount of $7,919.92 and determined the "net additional tax" as $98.24.

The petitioners were bona fide residents of a foreign country during the taxable year.

#### OPINION

Section 911 of the Internal Revenue Code of 1954 deals with earned income from sources without the United States. Section 911(a) lays down the general rule that items specified in sections 911(a)(1) and

911'(a) (2) shall not be included in gross income and shall be exempt from taxation. Section 911(a)(1) deals with a U.S. citizen as a bona fide resident of a foreign country. Section 911(a)(2) deals with the presence of a U.S. citizen in a foreign country for 17 months.

On brief, the respondent conceded (1) that the provisions of section 911(a)(2) are inapplicable, and (2) that Kwajalein is a foreign country within the meaning of section 911, but he contends, nevertheless, that the provisions of section 911(a)(1) are inapplicable. These concessions narrow the issue to the question of whether petitioners were bona fide residents of Kwajalein within the meaning of section 911(a)(1), set forth in the margin.[1]

The statutes contain no definition of the term "bona fide resident of a foreign country." The legislative history of the pertinent provisions of the Codes have been examined by the courts to ascertain the meaning and the intent of Congress in using the term, *Arthur J. H. Johnson*, 7 T.C. 1040 (1946); *Downs* v. *Commissioner*, 166 F. 2d 504 (C.A. 9, 1948), certiorari denied 334 U.S. 832; *Meals* v. *United States*, 110 F. Supp. 658 (D.Cal. 1953); *Weible* v. *United States*, 244 F. 2d 158 (C.A. 9, 1957); and *Sochurek* v. *Commissioner*, 300 F. 2d 34 (C.A. 7, 1962); but the decisions are not harmonious and no definition can be formulated from the decided cases. As we pointed out in *Donald H. Nelson*, 30 T.C. 1151 (1958), each case must be decided upon its own unique facts; see also *Sochurek* v. *Commissioner, supra* at 37.

The parties are substantially in accord as to the facts. Their differences involve the significance of such facts under the statutory provisions. Respondent's position, as we understand it, is that petitioner could not be a bona fide resident of Kwajalein because of the trusteeship arrangement between the United States and the United Nations; that under the trusteeship agreement the United States was the governing authority on the island; that there was no foreign community on the island; that the community was composed of citizens of the United States with security clearance from the Department of Defense; that there could not be under the circumstances herein par-

---

[1] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.
(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:
(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

ticipation generally by petitioner in the life of a foreign community and some assimilation into a foreign environment; that petitioner was on the island solely to conduct anti-missile missile tests for Bell under its contract with the United States; and that the reasoning in the recent case of *Commissioner* v. *Matthew*, 335 F. 2d 231 (C.A. 5, 1964), certiorari denied 380 U.S. 943, reversing 38 T.C. 417, applies with even more force to the unique facts in this case.

In response to respondent's argument that he never could become a bona fide resident of Kwajalein under the trusteeship agreement and the *Matthew* case, petitioner points out that the United States administers the Trust Territory of the Pacific Islands (including Kwajalein) on behalf of the United Nations, that any and all governmental acts of the United States relating to Kwajalein are accomplished as a trustee of the United Nations, and furthermore, and of crucial significance here, that all civilian occupants of the Marshall Islands are subject to the laws and courts of the trust territory. He also contends that the Fifth Circuit decided the *Matthew* case, solely on the ground that the extraterritorial rights, privileges, and immunities granted U.S. citizens, in the treaty between Great Britain and the United States, prevented the taxpayer's physical presence from ripening into actual residence in a foreign country, and that absent the treaty the Fifth Circuit would have held for the taxpayer.

The parties have stipulated the provisions of the trusteeship agreement between the United Nations and the United States and we have incorporated such provisions into our findings by reference. A summary of the more pertinent provisions thereof will aid in resolving the question presented. The trusteeship agreement placed the islands, formerly held by Japan under mandate in accordance with article 22 of the Covenant of the League of Nations, under the International Trusteeship System established by articles 75 through 80 of the Charter of the United Nations;[2] it designated the United States as the "administering authority of the trust territory"; it provided that the "administering authority shall have full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of this agreement"; it provided that in discharging the obligations of trusteeship in the trust territory, the administering authority "shall act in accordance with the Charter of the United Nations, and the provisions of this agreement, and shall, as specified in Article 83(2) of the Charter, apply the objectives of the international trusteeship system, as set forth in Article 76 of the Charter, to the people of the trust territory"; it obligated the administering authority to carry out the objectives of the United Nations which, among other

[2] 59 Stat. 1033, 1048–1051.

things, were: To further international peace and security, to promote the political, social, educational, and economic advancement of the inhabitants of the trust territory and their progressive development toward self-government, to encourage respect for human rights and fundamental freedoms without distinction as to race, sex, language, or religion, to encourage the recognition of the interdependence of all peoples, and to insure the equal treatment in social, economic, and commercial matters for all members of the United Nations and their nationals and equal treatment for all nationals in the administration of justice; and the agreement provided generally for the conduct and operation of the trusteeship by the administering authority.

We consider first whether the arrangement under the trusteeship agreement is sufficiently similar to the treaty arrangement in the *Matthew* case that that case is controlling here. In our opinion the arrangements were different and not similar. Here, there was no granting of extra territorial rights, privileges, or immunities to citizens of the United States in the Territory of the Pacific Islands, or Kwajalein Island. Instead of granting rights, privileges, and immunities to the United States and its citizens, the trusteeship arrangement imposed burdens and obligations upon the United States which required it to act in accordance with the Charter of the United Nations and the provisions of the trusteeship agreement and to apply the objectives of the international trusteeship system to the people of the trust territory. The governmental and administrative acts of the United States in discharging its obligations under the trusteeship agreement were fiduciary in character; it acted as the representative of all member nations, and the nationals of each were entitled to equal treatment under the charter and the trusteeship agreement. The citizens of the United States acquired no special rights, privileges, or immunities under the charter of the trusteeship agreement, and were entitled to none. On the contrary, the parties have stipulated and we have found that petitioner was subject to the laws of the trust territory along with all civilian occupants of the Marshall Islands. Under these circumstances, the rule announced in the *Matthew* case is inapplicable.

The remaining question is whether the facts and circumstances herein establish that petitioner was a bona fide resident of Kwajalein. The pertinent regulations, sec. 1.911–1(a)(2), Income Tax Regs., provide that whether a taxpayer is a bona fide resident of a foreign country shall be determined in general by the application of the regulation relating to what constitutes residence or nonresidence in the United States in the case of an alien individual. The regulation that deals with determining the residence of alien individuals is section 1.871–2,

Income Tax Regs., and subsection (b) thereof is set forth in the margin.[3]

An analysis of the facts of this case in the light of the regulations and the decided cases, particularly *Weible* and *Sochurek* convinces us that petitioner was a bona fide resident of Kwajalein. He was not a mere transient or sojourner on Kwajalein. His previous experience as director of White Sands made him conversant with the scope of his assignment at Kwajalein, which was to prepare, install, and operate radar and missile sites and staff and equip laboratory and office facilities. He discussed his assignment with management and with company counsel. Thereafter, he sold his house in Las Cruces, resigned from the country club, and moved his family and possessions to Kwajalein, where he resided throughout the taxable year. We are satisfied that petitioner moved to and lived on Kwajalein with the intention of staying there for an indefinite period. Furthermore, we are satisfied that the nature and duration of his assignment was such that there were no prospects or probabilities that such assignment could be promptly accomplished within a definite or specified time.

Our findings reflect the community life, activities, and functions on Kwajalein. It is clear that petitioner and his wife participated in many of these community activities and were identified with the daily lives of the Marshallese and other people on the island. They employed Marshallese as domestic help. They entertained and attended social functions with the Marshallese, United Nations, and trust territory people. They attended church, supported local youth movements, assisted in and contributed to charities for the Marshallese people and hospital, patronized the local stores, opened accounts with the local bank, and participated generally in the business and affairs of their community. They were in fact an integral part of the community in which they lived.

In this connection respondent stresses in both briefs that the population of Kwajalein consisted of U.S. Government personnel, per-

---

[3] Sec. 1.871–2. Determining residence of alien individuals.

(b) *Residence defined.* An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

sonnel of contractors and subcontractors with the United States, and various support personnel. He then points out that the so-called natives were not allowed on the island except between the hours of 8 a.m. and 4 p.m. after which they were returned to their homes on one of the neighboring islands. It is stipulated that several hundred Marshallese are employed on Kwajalein and that all natives returned to their homes on one of the other adjacent islands every night. It is not stipulated, however, that they were *not allowed* on Kwajalein except when employed there. The inference drawn by respondent from paragraph 9 of the stipulation of facts is refuted by statements appearing on page 71 of joint Exhibit 2–B, part of such stipulated facts, which statements are as follows:

One of the problems of the administration is the improper diet on Ebeye. The people cannot raise local foods because there is no room. The other islands of the atoll produce nothing *because everyone prefers to live on Ebeye.* [Emphasis supplied.]

Other factors considered by the decided cases in determining whether a taxpayer has established that he was a bona fide resident of a foreign country include his good faith in going abroad and whether it was for the purpose of tax evasion, his assumption of economic burdens and payment of taxes to the foreign country, the treatment accorded his income tax status by his employer, the nature, extent, and reasons for temporary absences from his temporary foreign home, his physical presence in the foreign country consistent with his employment, and his marital status and the residence of his family. See *Sochurek* and cases there cited.

Our findings reveal that petitioner qualifies under practically every one of these factors. No lack of good faith or intent to evade tax can be charged to petitioner for going abroad since he was sent to Kwajalein by his employer. It is stipulated that the trust territory does not assess taxes against anyone and therefore he had no tax burden to a foreign country. His income tax status with his employer was considered that of a bona fide resident of a foreign country, but, for personal reasons, he authorized withholding from his salary so as to protect himself and family from possible income tax liability. Petitioner's absences from Kwajalein during the taxable year were for business purposes and in connection with his wife's illness and surgery. His physical presence on Kwajalein in connection with his employment and the residence of his wife thereon are clearly shown by the stipulated facts and the testimony and are favorable to petitioner's claim that he was a bona fide resident of a foreign country.

We have carefully considered the authorities cited by the parties in reaching our conclusion that petitioner was a bona fide resident of a foreign country within the meaning of section 911(a)(1), *supra.*

294

Any review thereof would simply belabor a question that turns necessarily upon facts unique to this case. In so concluding we have not overlooked *Baden* v. *United States*, 233 F. Supp. 185 (D. Ohio 1964), which, upon facts substantially similar to the *Matthew* case, followed the latter decision.

The petitioners' tax liability for the taxable year should be redetermined in accordance with this opinion.

*Decision will be entered under Rule 50.*